UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MATTHEW HEALY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Cause No.: 1:11-cv-01184-WTL-DML |
| | ) | |
| NATIONAL BOARD OF | ) | |
| OSTEOPATHIC MEDICAL | ) | |
| EXAMINERS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT NATIONAL BOARD OF
OSTEOPATHIC MEDICAL EXAMINERS, INC.'S
POST TRIAL BRIEF**

I.  **Introduction**

Plaintiff filed suit against the Defendant under Title III of the ADA, 42 USC § 12189 claiming that he has a reading disorder, disorder of written expression[1], anxiety disorder, and ADHD that warrants test accommodations of double time and a separate quiet room for COMLEX-USA Level 1 examination administered by Defendant.

Title III provides that, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation," *42 U.S.C. § 12182(a)*, and that "any person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations . . . in a place and manner accessible to persons with disabilities or offer

---

[1] It is questionable at this point whether Plaintiff is still claiming this particular disorder as there was no testimony at trial regarding this claim.

alternative accessible arrangements for such individuals," *42 U.S.C. § 12189; 28 CFR 36.102-36.104[2]*. There is no dispute that NBOME is subject to the provisions of Title III.

The issues for determination by the Court are whether or not Plaintiff has a physical or mental impairment that substantially limits one or more of his major life activities, compared to most people in the general population, as required by the Americans with Disabilities Act (ADA). And, if Plaintiff is determined by the Court to have such a "disability" as required by the ADA, whether double the standard examination time and/or a separate, quiet room requested by the Plaintiff is an appropriate accommodation for that "disability".

## II.  Background

### A.  Purpose and Mission of NBOME

The Defendant, National Board of Osteopathic Medical Examiners, Inc. (the "NBOME"), is a nonprofit corporation, organized under the laws of the state of Indiana, dedicated to serving state licensing agencies and the public by administering examinations testing the medical knowledge of those who seek to serve the public as osteopathic physicians. NBOME's mission is to protect the public by providing the means to assess competencies for osteopathic medicine and related health care professions. The NBOME administers the standardized three level Comprehensive Osteopathic Medical Licensing Examination (COMLEX-USA) which is the primary pathway to licensure for osteopathic physicians seeking to practice osteopathic medicine. *(NBOME Bulletin of Information, Exhibit 201-02, pg. 128)*

### B.  COMLEX-USA Level 1 Examination

The test at issue in this case is the COMLEX-USA Level 1 Examination which is the first

---

[2] The Department of Justice is the agency authorized to issue regulations implementing specific provisions of the ADA under Title III. The Court may also draw guidance from views of the agencies authorized to administer other sections of the ADA. *Sinkler v. Midwest Prop. Mgmt. Ltd. Partnshp., 209 F.3d 678 (7th Cir. 2000) citing, Bragdon v. Abbott, 524 US 642, 646 (1998).*

examination of the COMLEX-USA series. The examination is taken in one day and consists of

two four-hour test sessions, each containing questions related to diverse clinical presentations. It

is a computer based multiple choice examination that is a problem based and symptom based

assessment. The candidate must successfully complete this examination before proceeding to the

other examinations. Passing this test certifies that candidates have demonstrated qualification in

the basic medical sciences and osteopathic principles as required to solve clinical problems.

*(NBOME Bulletin of Information, Exhibit 201-02, pg. 135)*

### C. Plaintiff's Request for Accommodation to NBOME

There is no dispute that Mr. Healy requested accommodations and that his requests were

denied by NBOME. In order to obtain a test accommodation under the ADA for an examination

of the NBOME, the candidate must complete and submit to the NBOME a written request for an

accommodation with supporting documentation[3]. If an application for an accommodation under

the ADA is not approved as requested, and the candidate thereafter obtains new and compelling

data or information supporting his or her request, the candidate may request that the NBOME

reconsider its decision. *(NBOME Bulletin of Information, Exhibit 201-02, pg. 142, 144; NBOME*

*Request for Test Accommodation, Instructions and Forms, Exhibit 201-03, pg. 163-170)*

The Test Accommodations Committee (TAC) is the committee that considers and

approves or denies the requests for ADA test accommodations on behalf of the NBOME. The

TAC is comprised of a group of physicians with various backgrounds, experience and

specialties. The TAC carefully considers each request for accommodation and determines on a

case-by-case basis whether a candidate has adequately documented with credible and objective

---

[3] The Department of Justice provided that it is appropriate for a testing entity to request documentation supporting existence of, as well as the nature of, the disability. *See, 28 CFR Part 36, App. B, at 737 (2010)*

evidence that he or she is a "person with a disability" under the ADA[4]. They endeavor to provide such accommodations in a conscientious manner while maintaining the integrity of the examination because inaccurate or inappropriate accommodations could affect the quality of medical care provided by the examinee to the general public.

On May 29, 2010 Plaintiff submitted his Request for Test Accommodation to the NBOME with initial documentation. *(NBOME File, Exhibit 201-01, pg. 1-15)* NBOME forwarded the neuropsychological evaluation submitted by Plaintiff to Dr. Bernier for review and he provided a report dated June 12, 2010[5]. *(NBOME File, Exhibit 201-01, pg. 16-18)* As Dr. Magen, Chair of TAC, has testified, after the careful review of the Plaintiff's request for accommodation and all documentation submitted, on June 23, 2010, the TAC denied, by unanimous vote, Plaintiff's request. *(NBOME File, Exhibit 201-01, pg. 19-20)* A letter was then forwarded to Plaintiff on July 12, 2010 advising him of the denial and basis of the determination. *(NBOME File, Exhibit 201-01, pg. 21-22)* On September 17, 2010 Plaintiff forwarded a request for reconsideration of the denial and submitted additional documentation for consideration by TAC. *(NBOME File, Exhibit 201-01, pg. 23-70)* The additional documentation was forwarded to Dr. Bernier for review and he submitted a report dated September 23, 2010. *(NBOME File, Exhibit 201-01, pg. 71-76)* On September 29, 2010, after careful review and consideration of additional information, the TAC unanimously denied Plaintiff's reconsideration. *(NBOME File, Exhibit 201-01, pg. 77)* A letter dated September 30, 2010 was then forwarded advising of the denial and basis for determination. *(NBOME File, Exhibit 201-01, pg. 78)*

---

[4] Whether the documentation establishes (a) the existence of a physical or mental impairment; (b) whether the applicant's impairment substantially limits one or more major life activities within the meaning of the ADA; and (c) whether and how the impairment limits the applicant's ability to take the exam under standard conditions. *See, 28 CFR Part 36, App. B, at 737 (2010)*

[5] The Department of Justice acknowledges the right of testing entity to have the information reviewed by one or more qualified professionals and make a determination based upon totality of the information. *See, 28 CFR Part 36, App. B, at 737 (2010), See also, Settlement Agreement between DOJ and NBME, #202-16-181 (February 23, 2011).*

Plaintiff appealed the denial of his request for accommodations on March 18, 2011 and submitted additional documentation. *(NBOME File, Exhibit 201-01, pg. 83-100)* The NBOME submitted all documentation received by Plaintiff to Dr. Murphy for review and he submitted a report dated April 7, 2011. *(NBOME File, Exhibit 201-01, pg. 105-108)* On June 7, 2011 after careful review and consideration of the totality of the evidence in this matter, as Dr. Magen has testified, TAC unanimously denied Plaintiff's appeal. The NBOME notified Plaintiff, by letter, regarding TAC's denial of his appeal. *(NBOME File, Exhibit 201-01, pg. 121, 122-123)* Plaintiff filed suit on August 31, 2011. *(Plaintiff's Complaint, Docket No. 1)*

### D. **Plaintiff's Evaluations in Childhood**

In 1984, when Plaintiff was age 3, a speech and language evaluation indicated weakness in intelligible speech but no fundamental impairment in language itself as his expressive language skills were at age level and his receptive language skills were above average. *(Ex. 101-01, Bate No. 1-4)* He received speech therapy and was discharged a year later having made substantial progress with no further treatment recommended. *(Ex. 101-01, Bate No. 6-7)* In 1986, he was evaluated and displayed normal speech and receptive and expressive language skills for his age. *(Ex. 101-02, Bate No. 12-13)* When Plaintiff was 8 years old he was evaluated for a learning disability. It was noted that Plaintiff would get frustrated and that he was a perfectionist and had difficulty handling a situation where he cannot be in control and correct all of the time. He demonstrated excellent attention and concentration throughout both days of the testing session. *(Ex. 101-03, Bate No. 15)* His tests revealed results, including subtests, all within the average range or above. No reading disability was diagnosed. He was noted to have age and grade appropriate reading skills. *(Ex. 101-03, Bate No. 16-20)*

### E.    Plaintiff's Academic History

Plaintiff attended elementary school through 5th grade at a Montessori school.  During this time, his performance on timed standardized achievement tests were above the national average *(Ex. 101-04, Bate No. 25-31)*  In fact, the school referred him for the challenged program in middle school indicating that his achievement and performance levels were above average. *(Ex. 101-04, Bate No. 32-35).*  In middle school, Plaintiff's transcripts indicated that he received mostly A's.  *(Ex. 101-05, Bate No. 38-41)*  Throughout high school, Plaintiff's grades placed him at the top of his class.  *(Ex. 101-06 to 101-08, Bate No. 43-54)*  And, on the timed standardized college entrance examinations, SAT and ACT, that he took without accommodations, his scores were above the national average.  *(Ex. 101-09 to 101-10, Bate No. 55-57)*

Plaintiff's first year at New York University in the fall of 2001, he received 9 A's and 1 B for his courses, without accommodations.  *(Ex. 101-11, Bate No. 59, 110)*  As a result of his first year grades, he received a scholarship.  *(Ex. 101-11, Bate No. 118)*  In the fall of 2002, Plaintiff's second year of college, he changed his major to pre-med.  He obtained a B+ in General Chemistry, A- in General Chemistry Lab, and an A in Pre-Calculus Mathematics. Plaintiff withdrew from his Chemistry I class.  *(Ex. 101-11, Bate No. 59, 110)*

In the fall of 2007, Plaintiff began courses at Touro College of Osteopathic Medicine. *(Ex. 101-15, Bate No. 424)*  However, Plaintiff withdrew from classes in his first semester due to problems with alcohol and received treatment at Accelerated Recovery Center for over 10 months.  *(Ex. 101-15, Bate No. 424, Ex. 101-16, Bate No. 469)*  Plaintiff returned to classes at Touro and repeated his first year in the fall of 2008.  *(Ex. 101-15, Bate No. 424)*

## F.    Plaintiff's Evaluations in Adulthood

As confirmed by testimony of the Plaintiff and his mother, there was no evaluation or treatment of Plaintiff from 1989 until 2002, a period of over thirteen (13) years.  Plaintiff was seen by Amanda Baten, Ph.D. in November of 2002 for evaluation of a learning disability for purposes of seeking accommodations in his second year of college.  *(Ex. 101-12, Bate No. 183-288)*   In September of 2006 Ms. Baten evaluated Plaintiff again for the purposes of accommodations for the MCAT.  *(Ex. 101-12, Bate No. 276-285)*   Although Ms. Baten acknowledged she is not an expert in neuropsychological evaluations, on both occasions she conducted, analyzed and based her opinions on the neuropsychological tests.  *(Ex. 101-12, Bate No. 287)*  In 2002, she diagnosed Plaintiff with a reading disorder, disorder of written expression, and R/O anxiety disorder NOS[6].  In 2006, she diagnosed Plaintiff with reading disorder NOS and anxiety disorder NOS.  *(Ex. 101-12, Bate No. 285)*   Ms. Baten testified that Plaintiff's writing improved and therefore in 2006 she did not diagnose a writing disorder.  *(Ex. 101-12, Bate No. 280-281, 284)*

Her basis for diagnosis of reading disorder was his "slow processing speed and difficulties with visual reading".  *(Ex. 101-12, Bate No. 184, 284)*   However, in these areas he was still in the average range as compared to most people in the general population.  *(Ex. 501-02, Dep. Pg. 36)*   And, the overall results confirmed that Plaintiff's intellectual and academic achievement abilities were above average as compared to most people in the general population.  *(Ex. 101-12, Bate No.  183-208 and Ex. 101-17 and 101-18, Bate No. 529-520)*

On both examinations, Ms. Baten indicated that Plaintiff "performed much better on tasks that assessed his capability to read sentences and paragraphs and answer questions about what was read."  *(Ex. 101-12, Bate No. 194, 280)*  As Dr. Magen has testified, this is the exact format

---

[6] Ms. Baten testified that this was "not otherwise specified".  *(Ex. 501-02, Dep. Pg. 40)*

for the test for which Plaintiff is seeking an accommodation. In 2006, Ms. Baten indicated that Plaintiff's overall thinking and reasoning abilities exceed those of approximately 96% of same aged peers and advised that he "will likely experience ease in completing tasks that require age appropriate thinking and reasoning abilities". *(Ex. 101-12, Bate No. 282)*

From October of 2002 through January of 2003, Plaintiff was seen by Ms. Baten for counseling related to his adjustment from skating career to college at an older age, making friends, sexual identity, and dealing with his relationships with his family. *(Ex. 101-12, Bate No. 254-258; Ex. 501-02, Dep. Pg 38)* Ms. Baten has testified these conditions were transient and that he sought no further treatment with her. *(Ex. 501-02, Dep. Pg 38 )*

During her treatment from 2002 through 2006, Ms. Baten did not diagnose Plaintiff with ADHD. *(Ex. 501-02, Dep. pg. 41)* In fact, in 2002 Plaintiff's score on the Wender Utah Rating Scale was "well below the cutoff score" for symptoms of ADHD. *(Ex. 101-12, Bate No. 193; Ex. 501-02, Dep. pg. 41)* In 2006, neither Plaintiff nor his mother endorsed items consistent with diagnosis of ADHD. Again, Plaintiff's score was well below the cutoff for symptoms of ADHD. *(Ex. 101-12, Bate No. 277; Ex. 501-02, Dep. pg. 42)* The last time Ms. Baten evaluated Plaintiff was in September of 2006. *(Ex. 101-12, Bate No. 183-288)*

Two months after Plaintiff's evaluation by Ms. Baten, Plaintiff saw Dr. Brewer, a psychiatrist who treats Plaintiff's mother and is known to the Plaintiff's family. Dr. Brewer testified that Plaintiff's complaints with anxiety were related to his unsuccessful attempts at getting into medical school and test-taking anxiety. *(Ex. 501-01, Dep. Pg. 7, 8)* He diagnosed him particularly with anxiety not otherwise specified because he did not elicit all the criteria for a specific anxiety diagnosis. *(Ex. 501-01, Dep. pg. 8)* At the initial evaluation Plaintiff also did not endorse any symptoms that met the minimum criteria for diagnosis of ADHD. *(Ex. 501-01,*

*Dep. Pg. 41-42)*  However, despite acknowledging that ADHD is a disorder with onset of signs and symptoms in childhood and that the only documentation in his file being Ms. Baten's report two months earlier specifically indicating no ADHD signs or symptoms, Dr. Brewer subsequently rendered a diagnosis of ADHD NOS without any further testing or validation through review of any historical documentation.  *(Ex. 501-01, Dep. Pg. 38, 43, 44)*

G.    **NBOME Expert Opinions**

Joseph Bernier, Ph.D., a psychologist with over 30 years of clinical general psychology practice experience and with a specialty in neuropsychological assessments, found that the objective documentation submitted for his review did not reflect a substantial limitation in reading that would prevent Mr. Healy from taking the osteopathic medical licensing examination under standardized conditions.  First, Dr. Bernier said that learning disabilities such as a reading disorder and disorder of written expression are chronic lifelong conditions, developmental disorders with childhood onset that would not first appear later in life, and there was no objective history of any learning disabilities during the early years of childhood when generally recognized.  Additionally, there was no evidence of functional disability from competency examinations, standardized tests and college entrance exams (SAT and ACT) where he measured in the above-average range.  Dr. Bernier indicated that the neuropsychological testing conducted in 2002 and 2006 by Dr. Baten failed to demonstrate substantial impairment in reading, reading comprehension, or the degree of reading proficiency needed to perform a timed multiple-choice examination.  In fact, the results indicated that Mr. Healy performed within the average and above average range as compared to most people in the general population on all diagnostic and placement tests. *(Ex. 301-01 to 301-05; 501-05, Dep. pg. 9, 10, 18, 26-31, 33-36)*

Kevin Murphy, Ph.D., a psychologist with over 15 years of clinical psychology practice experience and a specialty in ADHD, determined that the documentation failed to indicate ADHD or any disabling impairment. Dr. Murphy advised that ADHD is a developmental disability with a childhood onset that would not suddenly appear later in life. He believed that Mr. Healy provided no historical documentation indicating evidence of problems with attention, concentration, impulsivity, disorganization, distractibility, executive functioning, or self control over the course of his childhood, adolescence, or adult life. There was no documentation that his grades were poor and/or inconsistent or that he suffered any kind of academic, social, or behavioral deviance compared to same-aged peers.

Further, Dr. Murphy points out the lack of diagnosis of ADHD by Dr. Baten based upon no endorsement of any signs or symptoms consistent with ADHD by Plaintiff or his mother. He also noted that Dr. Brewer, who saw Mr. Healy only two months after Dr. Baten in 2006, also had Mr. Healy complete a questionnaire for ADHD which also did not endorse symptoms consistent with a diagnosis of ADHD. Yet, based merely on self report (which was inconsistent with the only documentation contained in Dr. Brewer's file) and without validating any of the information by review of historical documentation or conducting further testing, Dr. Brewer diagnosed Mr. Healy with ADHD and prescribed medication. In summary, Dr. Murphy found that there was no evidence of any functional impairment in any major life activity relative to most people in the general population. *(Ex. 301-06 to 301-09; 501-07, Dep. pg. 18-27, 33-34)*

## III.    Plaintiff is Not Disabled Under the ADA

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities." *42 U.S.C. § 12102(A).* In order to establish a disability under the ADA Plaintiff must prove that he has a physical or mental impairment that

substantially limits a major life activity *as compared to most people in the general population.* *29 C.F.R. § 1630.2(j)(1)(ii)*, not to Plaintiff's own elite ability or aptitude. This question is "an individualized one, and must be determined on a case by case basis." *DePaoli v. Abbott Labs, 140 F.3d 668, 672 (7th Cir. 1998).*

In *Bragdon v. Abbott, 524 U.S. 624(1998)*, the Supreme Court articulated a three-step process for determining whether a plaintiff has a disability under this subsection of the ADA. First, a plaintiff must show that he suffers from a physical or mental impairment. *Id. at* 631. Second, he must identify the activity claimed to be impaired and establish that it constitutes a "major life activity." *Id.* Third, the plaintiff must show that that impairment "substantially limits" the major life activity previously identified. *Id.*, *see also, DePaoli v. Abbott Labs, 140 F.3d 668, 671 (7th Cir. 1998); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 641 (2d. Cir. 1998)(*"In order to be eligible to prevail upon a further showing of discrimination, a plaintiff must satisfy each of the three prongs.")

Although the passage of the ADA Amendments Act of 2008, which took effect on January 1, 2009, raises some questions about the broad interpretation of the definition of disability, the standard and burden of proof remains the same, the Plaintiff must still establish the each element of the prima face case of disability under the ADA. *See, Rumbin v. Assoc. of American Medical Colleges, 803 F.Supp.2d 83, 92-93 (D. Conn. 2011).*

### A.    Mental Impairment

Mental impairment means any mental or psychological disorder, such as intellectual disability (formerly termed "mental retardation"), organic brain syndrome, emotional or mental illness, and specific learning disabilities. *29 C.F.R. § 1630.2(h)(2).*

Plaintiff alleges mental impairment of reading disorder, ADHD, and anxiety disorder. Based upon the evidence from expert testimony in this case as previously explained above and discussed in further detail below, there is no evidence that substantiates Plaintiff has suffered a specific mental impairment as required under *29 C.F.R. § 1630.2(h)(2)*. Nonetheless, a mental impairment alone is not a "disability" under the ADA. The impairment must substantially limit one or more major life activities as compared to most people in the general population.

**B.      Major Life Activities**

Major life activities include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating and working." 42 U.S.C.A. § 12102(2). Plaintiff alleges that Plaintiff is limited in the major life activities of reading, concentrating and learning[7].

Plaintiff claims he has difficulty in timed test-taking situations. However, test-taking itself is not a major life activity. *Singh v. George Washington Univ. School of Medicine and Health Sciences, 667 F.3d 1, 3 (D.C. Cir. 2011)*. Additionally, succeeding in medical school is not a major life activity. *McGuinness v. University of New Mexico Sch. Of Med., 170 F.3d 974, 979 (10th Cir. 1998)*(for the purpose of the ADA, inability to pursue one career, such as medicine, does not constitute a severe impact on an individual's life).

**C.      Substantially Limits**

A substantial limitation is a limitation that renders an individual unable to perform a major life activity or that significantly restricts an individual in performing a major life activity. 29 C.F.R. § 1630.2(j). Even after the 2008 amendments to the ADA, "Not every impairment

---

[7] It is questionable at this point whether Plaintiff is still claiming, as originally alleged, that major life activities of thinking, writing, and communicating are also involved as there was no testimony at trial regarding these activities nor any contention in Plaintiff's pre-trial brief (pg. 9).

will constitute a disability." *29 C.F.R. § 1630.2(j)(iii).* An impairment must also "substantially" limit a major life activity, as compared to most people in the general population, not Plaintiff's own potential or aptitude.

The evidence in this case may show that although Plaintiff sought counseling for *adjustment* from his competitive skating career into college at an older age, personal and family issues, and unsuccessful attempts at getting into medical school as well as test anxiety, there is no evidence of a condition that rises to the level of a disability under the ADA. Impairments that are transitory and minor are not covered by the ADA. *42 U.S.C. § 12102(4)(D); See also, Cassimy v. Bd. Of Educ. Of Rockford Pub. Sch., 461 F.3d 932, 937 (7th Cir. 2006)*(isolated bouts of depression do not qualify as disabilities under the ADA); *Ogborn v. United Food & Commercial Workers Union, 305 F.3d 763, 767 (7th Cir. 2002)*(mental impairment that causes inability to work for a short period of time is not disability). Temporary, non-chronic impairments of short duration, with little or no long term permanent impact, are not disabilities. *See 29 C.F.R. app. Pt 1630, 1630.2(j) cited by Erjavac v. Holy Family Health Plus, 13 F.Supp.2d 737, 749 (N.D. Ill. 1998); McGuinness v. University of New Mexico Sch. Of Med., 170 F.3d 974, 978 (10th Cir. 1998)*(plaintiff must demonstrate that his anxiety impedes his performance in a wide variety of disciplines, not just chemistry and physics). Dr. Baten, Dr. Bernier and Dr. Murphy testified that Plaintiff's treatment for anxiety was transient and thus there was no evidence that he was psychiatrically disabled. *(Ex. 501-05, Dep., pg. 39-43, Ex. 501-07 , Dep pg. 28-32)*

Indeed, Plaintiff demonstrated his competence in reading, when he read to the Court at length a long passage, without any evidence that he was a "slow reader."

Plaintiff's testimony indicates that when he changed his major to pre-med in college, he sought accommodations because he had to withdraw from a chemistry class and in this instance his difficulty with a multiple choice exam. The inability to perform one single course, particular job or task, does not constitute a substantial limitation. *Leisen v. City of Shelbyville, 153 F.3d 805, 808 (7th Cir. 1998)*(plaintiff's inability to secure paramedic certification does not show that she was substantially limited in . . .learning, any more than the fact that a particular individual might not be able to pass a course in physics or philosophy would allow an inference that all learning activity was substantially limited); *Strujan v. Lehman College, 131 S. Ct. 142 (2010)*(the inability to perform in one college course not a disability); *Pacella v. Tufts Univ. Sch. Of Dental Med., 66 F.Supp.2d 234, 239 (D. Mass. 1999)*(even if Plaintiff's impediments substantially limited his ability to attend dental school, an impairment that interferes with an individual's ability to perform a particular function, but does not significantly decrease that individual's ability to obtain a satisfactory education otherwise, does not substantially limit the major life activity of learning); *Ristrom v. Asbestos Workers Local 34, 370 F.3d 763, 769-70 (8th Cir. 2004)*(the inability to pass a few highly specialized courses does not indicate an inability to learn under the ADA).

When an individual, in a higher education forum, claims to be substantially limited in the major life activity reading and learning, objective evidence regarding academic achievement will always be relevant to the analysis. Indeed, objective evidence relating to actual academic performance is very important because of the absence of a professional consensus regarding the proper diagnostic criteria for learning disabilities. *(Ex. 501-01, Dep. pg. 38)* Cognitive impairments cannot be confirmed in the same way as most physical impairments. Instead, as Dr.

Magen, Dr. Bernier and Dr. Murphy testified, you have to look primarily how the impairment has affected the individual in all aspects of his life.

The overall history of Plaintiff's academic, social and extracurricular achievements with no evidence of developmentally deviant behavior is not consistent with ADHD or any impairment with Plaintiff's ability to concentrate. *(Ex. 301-06; Ex. 101-03, Bate No. 15 "He demonstrated excellent attention and concentration throughout both testing sessions"; Ex. 101-15, Bate No. 446-452)* Additionally, there is no objective evidence that supports a reading disorder other than Plaintiff's testimony that he "reads slower than his classmates" and that he is the "last to finish tests and school work". *(Ex. 101-03; 101-04, Bate No. 25, 26, 28, 30, 33, Ex. 101-117 and 101-118)* Conclusory and vague generalities that Plaintiff's ability to read (i.e. read slower) and concentrate are substantially limited is insufficient. *EEOC v. Autozone, Inc. 630 F.3d 635, 643-44 (7ᵗʰ Cir. 2010); Heisler v. Metropolitan Council, 339 F.3d 622, 229 (8ᵗʰ Cir. 2003).*

Plaintiff alleges that his ability to learn is affected by his inability to concentrate and his reading disorder. However, the history is inconsistent with this contention. In addition to Plaintiff's illustrious academic history as reported by the school transcripts and standardized test scores, the recommendation letters written on behalf of Plaintiff is indicative of his ability to learn. *(Ex. 101-15, Bate No. 457-465).* In a given case, the evidence of academic performance might well be sufficiently compelling to conclude that no substantial limitation has been shown particularly when the impairment in question is a lifelong condition, such as a learning disability. This is such a case. *Singh v. George Washington Univ. School of Medicine and Health Sciences, 667 F.3d 1, 4 (D.C. Cir. 2011)*( the impairment must be shown to be the effective cause of the Plaintiff's limitation); *See, Settlement Agreement between DOJ and NBME, #202-16-181*

*(February 23, 2011)*(in determining whether to grant a request for testing modifications or accommodations for an individual who did not receive a diagnosis of a reading disability until later in his or her life, NBME shall consider bona fide, reasonably supported reasons for the late diagnosis as well as academic records and other objective evidence relating to the individual's reading ability); *Palotai v. University of Md. At College Park, 955 (4th Cir. 2002)*(individual's record of academic success undermines his contention that ability to learn is substantially limited); *Betts v. Rector and Visitors of Univ. of Va., 118 (4th Cir. 2001)*(although the record shows that Betts has a learning impairment, his impairment does not substantially limit his ability to learn in comparison to the general population. Betts has a history of academic achievement, and his learning abilities are comparable to the general population); *Herzog v. Loyola Coll. Of Md, Inc. 2009 WL 3271246* (plaintiff's record of academic success demonstrates his ability to perform at an above-average level).

### D. <u>Comparison Group</u>

The relevant comparison is not with other test-takers or future doctors, or even his own potential or aptitude, but rather, most people of the general population. *Rumbin v. Assoc. of Amer. Medical Colleges, 803 F. Supp.2d. 83, 93 (D. Conn. 2011).* The proper comparison is to the "general population, rather than to person of elite ability or unusual experience", i.e., "an injured ultramarathoner, who could once run 100 miles at a time, is not disabled by an impairment that forces him to quit after 26.2 miles, even though his limitation is substantial as compared to his unimpaired abilities and those of his erstwhile running partners". *Singh v. George Washington Univ. School of Medicine and Health Sciences, 408 F.3d 1097, 1100-01 (D.C. Cir. 2007) see also, e.g.Wong v. Regents of Univ. of California, 410 F.3d 1052 (9th Cir. 2005)*(the relevant question in determining whether a medical student with learning impairment

was substantially limited in the major life activities of reading and learning and was "not whether he might be able to prove to a trier of fact that his learning impairment makes it impossible for him to keep up with a rigorous medical school curriculum. It was whether his impairment substantially limited his ability to learn as a whole, for purposes of daily living, as compared to most people").

And, although Plaintiff indicates that the regulations passed for Title I of the ADAAA indicate that a comparison will not require scientific, medical or statistical analysis, the very same regulations specifically indicate that there is nothing intended to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate. *29 C.F.R. 1630.2(j)(1)(v)*. In fact, Courts determining whether individuals suffer from substantial limitations to the major life activities of learning and reading do so based on comparative tests of reading. *Gonzales v. National Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000)*.

In *Gonzales*, a medical student alleged a reading and writing disorder and requested accommodations for the first level of the licensing examination. *Gonzales v. National Board of Medical Examiners, 225 F.3d 620 (6th Cir. 2000)*. As with the Plaintiff in this case, Gonzales underwent neuropsychological testing and his performance in both reading and writing fell within the average to superior range when compared to most people in the general population. Additionally, similar to the history of Matthew Healy, there was no documented history of academic achievement below expectations that would support a diagnosis of learning disability. The Court found that he was not disabled under the ADA. *Gonzales at 625*. In *contrast* to the circumstance of this case, in *Bartlett*, the case relied upon by Plaintiff, where the Court found that the Plaintiff was disabled under the ADA, she had a specific diagnosis of dyslexia, low grades in her academic history, and her results of the neuropsychological testing revealed scores

below the average compared to most people in the general population. *Bartlett v. New York Bd. Of Law Exam'rs, 226 F.3d 69 (2nd Cir. 2000); Bartlett v. New York Bd. Of Law Exam'rs,No. 93-4986, 2001 WL 930792 (S.D.N.Y. Aug. 2001).* That has not been established in this case with Matthew Healy.

Furthermore, Plaintiff's claim that any disparity between inherent capacity and performance compels conclusion that an individual has a learning disability was rejected by the Court in *Pazer* stating that to hold otherwise would compel the conclusion that any underachiever would, by definition, be learning disabled as a matter of law. *Pazer v. New York State Bd. Of Law Examiners, 849 F.Supp 284, 287 (S.D.N.Y.).* The Court must decline Plaintiff's invitation to determine a learning disability for purposes of ADA based upon the discrepancy model because that analysis does not employ the proper comparison standard, and in any event, is unreliable and of questionable validity. *(Ex. 501-03, Dep. pg. 30-32; U.S. Senate Rep. 185, 108th Cong. 1st Sess. (Nov. 3, 3003)*(There is no evidence that the IQ-achievement discrepancy formula can be applied in a consistent and educationally meaningful (i.e. reliable and valid) manner.); *Bercovitch v. Baldwin School, Inc. 133 F.3d 141, 155-156 (1st Cir. 1998)*(Plaintiff who was diagnosed with ADHD was not found to be disabled under the ADA because although it may be found that he has an impairment and that his capacity to achieve his maximum potential was affected, he was not substantially limited in his ability to learn. He never experienced significant academic difficulties and although his grades dipped slightly, *he was still above average*.)

In the determination whether Plaintiff is a person with disabilities under the ADA, his alleged impairments (reading disorder, anxiety, ADHD) must be measured in comparison with

most people in the general population, not to his own IQ or potential.[8]  When this proper comparison to the average person is made, in considering all his claims of disabilities, it is clear that Plaintiff is not disabled for purposes of the ADA.

## IV. Reasonableness of Accommodation

If the Court determines that there is evidence in this case to substantiate that Plaintiff has a physical or mental impairment that substantially limits a major life activity as compared to most people in the general population, then the Court must determine whether double the standard examination time and/or a separate, quiet room requested by the Plaintiff is an appropriate accommodation for that "disability".

The purpose of the accommodations is not to facilitate success or optimize one's test scores.  A "reasonable accommodation" is one that gives the otherwise qualified Mr. Healy with disabilities "meaningful access" to the program or services sought. *Henrietta D. v. Bloomberg, 331 F.3d 261, 282 (2nd Cir. 2003) citing Alexander v. Choate, 469 U.S. 287, 301, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).*  Mr. Healy has the burden to prove, in addition that he is disabled for purposes of ADA, that a particular accommodation is necessary to provide him access to the examination.  *See, e.g., Argenyi v. Creighton University, 2011 WL 443117 (USDC, Neb. 2011); Powell v. Nat'l Bd. Of Med. Exam'rs, 364 F.3d 79, 85 (2d. Cir. 2004).*[9]  Plaintiff has failed to prove not only that he is disabled for purposes of the ADA, but that the accommodations he requests are necessary to provide him access to the COMLEX-USA Level 1 examination.[10]

---

[8] Ms. Baten based her diagnosis solely upon her comparison of Plaintiff's alleged achievements to his own IQ or potential, not to most people in the general population, and thus does not satisfy the requirements of the ADA.  *(Ex. 501-02, Dep. pg. 15)*

[9] Plaintiff incorrectly utilizes the "best ensure" standard in its analysis of whether or not there is a disability under the ADA.  The "best ensure" analysis applies as to whether accommodations requested are reasonable and/or appropriate *once a disability under the ADA has been established*, not whether a person is disabled under the requirements of the ADA.  *Enyart v. National Conf. of Bar Exam'rs, 2011 WL 5037977 (N.D. Cal. 2011).*

[10] It is questionable whether Plaintiff continues to maintain he has the disorder of written expression as there was no testimony from Plaintiff or his mother supporting this claim and Ms. Baten did not maintain this after her 2006

## V.  Conclusion

The evidence in this case does not establish any impairment that rises to the level of disability under the ADA.  Plaintiff had an illustrious academic history while engaged in a very successful, highly competitive skating career.  There is no evidence to suggest that he experienced any developmentally deviant behavioral, emotional or intellectual issues.  The overall results of the neuropsychological tests reflect intellectual and academic abilities above average as compared to most people in the general population, the proper standard under the ADA.  Thus, Matthew Healy is not the type of person that the law was designed to protect.  The evidence in this case fails to demonstrate that Matthew Healy has a physical or mental impairment that substantially limits a major life activity as compared to most people in the general population.  Thus an accommodation for NBOME's COMLEX-USA Level 1 examination is not warranted in this case.

Consequently, the determinations of NBOME's Testing Accommodations Committee, physicians appointed by the NBOME, with the responsibility to carefully evaluate on a case-by-case basis applications for ADA accommodations, consistent with the law and the mission of the NBOME to "protect the public by providing the means to assess competencies for osteopathic medicine" of those who seek to serve the public as osteopathic physicians, and who more than once carefully evaluated Plaintiff's application and all the documentation submitted relevant to his application for an ADA accommodation, should be upheld by this Court.

---

evaluation.  However, as the evidence in this case has shown, writing and communicating are not constructs that are measured by the COMLEX-USA Level 1 examination, so even if it was established that Plaintiff had a disability under the ADA in these areas, it would not impact his access to the exam or warrant accommodations for the examination.  *28 C.F.R. 36.309(b)(1)(i)*; *Gonzales v. NBOME, 225 F.3d 620, 630 (6th Cir. 2000).*

Respectfully submitted,

By:   s/ Kristen M. Carroll
Robert M. Kelso, Atty. No. 5441-49
Kristen M. Carroll, Atty. No. 23129-49A
KIGHTLINGER & GRAY, LLP
151 North Delaware Street, Suite 600
Indianapolis, IN 46204
rkelso@k-glaw.com
kcarroll@k-glaw.com
(317) 638-4521

By:   s/ Sydney L. Steele
Sydney L. Steele, Atty. No. 694-49
KROGER, GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204-5125
sls@kgrlaw.com
(317) 692-9000

Attorneys for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of April, 2012, a copy of the foregoing was filed electronically.  Notice of the filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Andrew Dutkanych III
Kyle F. Biesecker
Lauren Berger
BIESECKER, DUTKANYCH & MACER, LLC
411 Main Street
Evansville, IN 47711
kfb@bdlegal.com
ad@bdlegal.com
lberger@bdlegal.com

By:   s/ Kristen M. Carroll
Robert M. Kelso/Kristen M. Carroll

KIGHTLINGER & GRAY, LLP
151 North Delaware Street, Suite 600
Indianapolis, IN 46204
(317) 638-4521