# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **MATTHEW HEALY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Cause No. 1:11-cv-1184-WTL-DML** |
| | ) | |
| **NATIONAL BOARD OF OSTEOPATHIC** | ) | |
| **MEDICAL EXAMINERS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ENTRY FOLLOWING BENCH TRIAL

Plaintiff Matthew Healy brings this suit against Defendant National Board of Osteopathic Medical Examiners, Inc. ("NBOME") under the Americans with Disabilities Act. In the spring of 2010, Healy applied to take the COMLEX-USA Level 1 examination administered by NBOME with accommodations due to his disabilities. Initially and on appeal, NBOME denied Healy's request. Healy now brings this action seeking injunctive relief requiring NBOME to allow him to take the May 23, 2012, examination with accommodations. A bench trial was held on Healy's claim on April 19 and 20, 2012. The Court now rules as follows.

## I. LEGAL STANDARD

The ADA provides that "[a]ny person that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or post-secondary education, professional, or trade purposes shall offer such examinations or courses in a place and manner accessible to persons with disabilities or offer alternative accessible arrangements for such individuals." 42 U.S.C. § 12189. In order to avail himself of the protections this provision, Healy must show that he is a person with a disability, that his requests for accommodation are reasonable, and that those requests were denied. *E.g.*, *Ware v. Wyoming Bd. of Law Exam'rs*,

973 F. Supp. 1339, 1356 (D. Wyo. 1997). The Defendant does not dispute that NBOME falls

within the purview of this section of the ADA. Additionally, there is no dispute that Healy

requested accommodations and that his requests were denied by NBOME; therefore, the Court's

analysis will focus on the first two prongs.

## II. <u>FINDINGS OF FACT</u>

Matthew Healy first realized his own limitations one day when he was riding in the car

with his mother after school. Matthew, who at the time was in seventh grade, told his mother that

he had trouble saying the months in order. His mother replied that, when he was young, he had

the same trouble with numbers and letters. Matthew later reflected on this in a college essay

about language:

> From when I was two and a half to three years old, I knew all of my numbers and
> letters of the alphabet, but I could not say them in order. Any letter, or number,
> could be pointed to, and I would answer correctly, but if I was asked to say them
> in order, I was not able.

In the essay, Matthew methodically unfolds the story of language in his life with a depth of

feeling and a degree of intimacy unlikely to be found in any court brief. In this way, Matthew's

introspective sheds valuable light on what can only be a deeply personal inquiry. Cognizant that

Matthew is "able to understand more than [he] is able to communicate, in a given time period,"

the Court now turns to its findings of fact, which are based in part on Matthew's testimony.

Between the time Matthew was two and three years old, he experienced three separate

"altered states of consciousness," which consisted in varying degrees of lethargy, low-grade

temperature, and disorientation. During this time, Nancy Healy, Matthew's mother, took him to

the Language Center of Olney in Olney, Maryland, for a speech-language evaluation. The

evaluation revealed "almost a year's difference between receptive and expressive language

skills." Matthew received roughly seven months of speech therapy to address this difference, and he was discharged in January 1985. Matthew underwent another speech evaluation in April of 1986, during which he displayed normal speech and receptive and expressive language skills for his age. No speech-language pathology intervention was recommended.

After attending nursery school, Matthew attended elementary school at the Montessori School of Great Falls in Great Falls, Montana, and the Montessori School of Greenville in Greenville, South Carolina. At the age of eight, Matthew underwent another language evaluation by Dr. Madge Connor on the advice of his second-grade teacher at the Montessori School of Greenville. At the time, Mr. and Mrs. Healy reported that Matthew was easily frustrated with his school work, and they requested a particular evaluation as to his reading skills. While the evaluation revealed a "considerable amount of scatter" in his scores on various tests, Dr. Connor found that "all of the subtests were in the average range or above suggesting that he would not have any difficulty in those processing areas as compared to the typical child his age in the classroom." Overall, Dr. Connor found "no specific reading disability," although she did note that Matthew presented weaknesses in his high verbal abilities that involve sequencing and sequencing questions having to do with reading comprehension. She gave him a prognosis of "very good."

Matthew continued as a student at the Montessori School of Greenville. Records from the school for fourth and fifth grade reveal that, on achievement tests, many of Matthew's scores placed him in the 80th and 90th percentile ranges. Matthew's art teacher, Judy Mercer, did once remark that Matthew was "not very attentive during instruction" and seemed "distracted by those around him," but she remarked six months later that this was "much improved."

3

Report cards from Northwood Middle School similarly reveal strong academic skills. Matthew received mostly As and a few Bs on courses ranging from algebra and earth science to physical education and home economics.

Matthew's success was not limited to the classroom. Matthew began figure skating at the age of four, and by thirteen, Matthew had qualified for the United States Figure Skating Junior National Championships in two disciplines, free skating and ice dance. At the age of fifteen, he became a member of the United States National Figure Skating Team. He was a member of the national team for five years. Matthew was also a member of the International United States Figure Skating Team from 1997 through 2000.

Matthew juggled his figure skating career with his academic life. During his time on the national team, Matthew moved to further his figure skating training and, as a consequence, he attended three different high schools. However, just as before, each school's transcript reveals a strong academic record. At Lawrence North High School in Indianapolis, Indiana, Matthew earned mostly As and a few Bs. At Cardinal Ritter High School in Indianapolis, Matthew received As in tenth-grade Honors Algebra and Honors English, and As in eleventh-grade Honors English and Honors Pre-calculus. At the end of his eleventh grade year, Matthew ranked fifth in a class of ninety students. At Cheyenne Mountain High School in Colorado Springs, Colorado, Matthew earned As again.

After moving to Colorado Springs to train with his figure skating partner, Matthew achieved U.S. Figure Skating Gold test medals, a qualification required to compete in such elite competitions as the Olympics, in four different disciplines – Moves in the Field, Dance, Free Skating, and Free Dance. To achieve a gold test medal, a skater must invest a significant amount

of time, effort, and dedication to be able to master the skills needed for the test. According to his

figure skating coaches, many skaters come close to this level, but only those with true and

dedicated determination and perseverance actually achieve this level of accomplishment. In

2000, at the age of twenty, Matthew decided to end his skating career and attend college.

In preparation for college, Matthew took the SAT and the ACT. Matthew took the ACT

twice, and while he did not finish the exam, his reading composite score on the second test

placed him in the 71st percentile, while his overall composite score placed him in the 79th

percentile. Matthew took the SAT three times, and although again he did not complete the exam,

his third composite test score was a 1150, which Matthew himself characterized as "slightly

above the national average."

In the fall of 2001, Matthew enrolled at New York University ("NYU"). At the time of

his enrollment, Matthew sought a bachelor of science degree in sports management and leisure

studies. It was during this time that Matthew wrote his essay about language, including the

following passages:

> Since there was such a range in my scores [on tests conducted by Dr.
> Connor], it showed that my brain worked at different speeds. I am able to process
> thoughts faster than I am able to communicate them. When trying to communicate
> the original thoughts, I am processing new ones, constantly rethinking what I am
> saying.
>
> [ . . . ]
>
> I realized when writing I had problems with organization, but I didn't realize that
> with thought I had difficulty with it as well. I never included this problem I had
> into my everyday life; as I mentioned earlier, no exceptions were needed to be
> made for me, so I dealt with my problems unconsciously, not completely realizing
> I process information differently.
>
> [ . . . ]

This realization of processing thought makes me reevaluate why I am the way I am. I have always been considered a shy, introverted person. I believe, to an extent, this has to do with this difficulty and frustration I have explaining myself. [ . . .] When I was eight years old I was described by my parents and teachers as well as by the observation of my examiner that I "tend to be a perfectionist and have difficulty handling situations where I cannot be in control and correct all of the time. I think this connection with being a perfectionist also shows why I become frustrated. Not only do I try to cover up my flaws, I have a difficult time explaining myself to make my opinions understood and "correct" in other's minds.

[ . . . ]

Even though I have this difficulty, I still do not want exceptions made for me. Exceptions and excuses ultimately only hold a person back. But with understanding hindrances, I hopefully can anticipate the problem and deal with it. I can consciously confront this difficulty I have. I can better deal with the problem, therefore it can be minimized.

In the fall of 2002, Matthew changed his major[1] and began taking courses in preparation for medical school. Shortly after changing his major, Matthew realized during his chemistry class that he could not finish the exam, so he requested testing accommodations. NYU referred Matthew to Dr. Amanda Baten, who examined him in November 2002.

Dr. Baten's thorough report noted that "Matthew reports that while he had very high grades all through his academic career, he has always had to work very hard and experienced frustrations with the material, particularly in reading and writing, and areas where he had time limitations." However, Dr. Baten ruled out a diagnosis of ADHD, noting that "On [one test for ADHD], he obtained a total score of 16, which is well below the cutoff score for childhood symptoms of ADHD. He endorsed having moderate problems with anxiety and low frustration tolerance. He did not, however, endorse items that suggest ADHD."

---

[1] NYU records indicate that this was an "individualized major" in the Gallatin School of Individualized Study; however, other records indicate that this major was essentially "pre-med."

Dr. Baten did find, however, that Matthew's "Reading Speed, however, is significantly lower (1st quartile = bottom 25%) than his Reading Comprehension, which is higher than approximately 99% of his peers, placing these skills in the Very Superior Range, and suggests that while he has superior ability in reading, he needs extra time to work accurately." Other tests similarly noted that Matthew's processing speech was "relatively slower" than other indices. Dr. Baten then summarizes:

> Matthew is a 21-year-old young man of generally superior to very superior neurocognitive skills. He shows a pattern of performance consistent with a diagnosis of Developmental Reading Disorder and a Disorder of Written Expression. Records indicate that these problems began at an early age. Matthew is very intelligent, but his deficits result in him having to process information and produce work slowly. While he has compensated for these deficits well, and with the help of a persevering attitude, he would benefit greatly with appropriate accommodations in school.

It was also noted that Matthew experiences anxiety, likely as a result of his learning disabilities. Ultimately, Dr. Baten diagnosed Matthew with a reading disorder and a disorder of written expression, and she suspected that he had an anxiety disorder. She recommended that Matthew received accommodations such as extra time to take tests and write papers, quiet testing settings, and access to tutors.[2] Recognizing Dr. Baten's recommendations, NYU afforded Matthew double time and a private testing room for all his classes. Matthew graduated from NYU in May 2005.

Even while studying at NYU and later preparing for medical school, Matthew found time to volunteer. From August 1998 until March 2006, Matthew was a volunteer Special Olympics figure skating coach, and between August 2005 and March 2006, Matthew created, organized,

---

[2] Dr. Baten also recommended psychotherapy to improve Matthew's healing mechanisms and alleviate any emotional distress related to his learning difficulties. Matthew was later treated by Dr. Baten for anxiety issues from October 2, 2003, to January 28, 2004.

7

and taught a Special Olympics figure skating program in Manhattan, New York.

After graduating from NYU, Matthew took the Medical Colleges Admission Test ("MCAT") in August 2005 and August 2006. Matthew requested and was ultimately approved for accommodations, which consisted of double time and a quiet room, on both administrations of the MCAT. However, the MCAT administration required a re-evaluation before providing Matthew with accommodations on the second exam. Matthew thus returned to Dr. Baten, who performed a second evaluation, which consisted of many tests. Dr. Baten's second evaluation was substantially similar to the first, as she again noted disparate reading comprehension and reading speed scores, a processing speed relatively slower than the other indices, and anxiety. Accordingly, she again diagnosed him with a reading disorder and an anxiety disorder.[3]

Prior to his admission to medical school, Matthew self-referred himself to Dr. Charles Brewer for treatment of his anxiety. Dr. Brewer is a board-certified psychiatrist who predominantly focuses his practice on attention deficit hyperactivity disorder (ADHD), depression, and anxiety disorders. During their initial visit on November 28, 2006, Matthew and Dr. Brewer discussed Healy's ongoing application to medical schools and related anxiety. While Matthew did not exhibit all the criteria for a specific diagnosis of anxiety disorder, Dr. Brewer determined that Matthew nevertheless exhibited enough criteria for an anxiety disorder NOS[4] diagnosis. This diagnosis was based in part on Dr. Baten's neuropsychological evaluation. The

---

[3] In a letter to an unknown recipient dated February 10, 2012, Dr. Baten explained that she did not include the diagnosis for a disorder of written expression because her evaluation was geared toward "maintaining accommodations for expanded time and substantiating the need for extended time on reading-based tasks."

[4] "NOS" means "not otherwise specified."

predominant characteristic Dr. Brewer noted with respect to Matthew's anxiety disorder was "anxiety related to the performance in a social setting or presentation whereby he might be evaluated, criticized, or be judged as being anxious or deficient present for [. . .] a period of at least six months that he either attempted to avoid whenever possible or encountered and endured with some degree of dread or difficulty." A prescription for Paxil was issued by Dr. Brewer for Matthew to treat this anxiety.

Dr. Brewer did not initially document his impression that Matthew suffered from ADHD at their November 2006 visit, and an ADHD self-report screen test given to Matthew at their first visit did not indicate possible ADHD. Nevertheless, after reviewing more information and meeting with Matthew further, Dr. Brewer diagnosed Matthew with ADHD and began a trial of medication. According to Dr. Brewer, the primary characteristics of an ADHD diagnosis are hyperactivity, impulsivity, and distractibility or inattention. A diagnosis is based on signs, what others observe, and symptoms, what individuals might report, that were present before the age of seven, that occurred in two or more environments, that caused impairment, and that were not best accounted for by another diagnosis or circumstance. With respect to Matthew, Dr. Brewer found his cognitive symptoms related to attention, failure to listen with detail, pay attention to detail, and difficulty listening with retention of the information being transmitted to indicate the presence of ADHD. Matthew also demonstrated difficulties in organization and prioritization, completing tasks, and feelings of carelessness, all of which were significant to Dr. Brewer's diagnosis. Following his diagnoses, Matthew continued to meet with Dr. Brewer for treatment, which treatment continued during medical school.

Ultimately, Matthew's MCAT scores secured him a spot on the waitlist at Touro College

of Osteopathic Medicine ("Touro"); he was admitted in August 2007. When Matthew completed the Touro "Technical Standards for Admission" form, he requested additional time to take examinations. In January of 2008, Matthew voluntarily took a leave of absence from Touro to seek medical treatment for an alcohol abuse problem. At the time of his admission to a treatment program, Matthew identified social anxiety, feeling overwhelmed, and feeling unprepared for medical school as reasons for his increased drinking. Matthew underwent treatment, and was formally readmitted to Touro in October 2008, where he repeated his first year of medical school.

Throughout his medical school career, Touro has granted Matthew's requests for accommodations. Matthew was permitted double time and a quiet exam room for all tests. He was also excused from Touro's mandatory attendance policy so that he could stream lectures online, which was a more effective note-taking strategy for him because he could rewind and play back as needed.

Touro requires each student to pass the COMLEX-USA Level 1 exam between his third and fourth years of medical school. When it came time for Matthew to take the exam, he submitted his registration with a request for accommodations supported by documentation on May 29, 2010, to the Defendant, NBOME, the entity that administers the exam. NBOME forwarded Matthew's request to Dr. Joseph Bernier, a licensed psychologist, for review. After reviewing Dr. Bernier's report, in which he found an insufficient basis to award accommodations, the NBOME's Testing Accommodations Committee ("TAC") unanimously voted to deny Matthew's request and advised him of its decision on July 12, 2010. In September 2010, Matthew requested reconsideration of the decision and submitted additional

documentation. Dr. Bernier reviewed Matthew's request and again submitted a report to the

NBOME testing committee that found an insufficient basis for accommodations. The TAC

unanimously voted to deny the request and apprised Matthew of its decision on September 30,

2010. Matthew appealed the denial of his request once more on March 18, 2011, and submitted

even more supporting documentation. The TAC submitted the file to Dr. Kevin Murphy, a

licensed psychologist, for review. Dr. Murphy also found an insufficient basis to award

accommodations, and the TAC voted unanimously to deny Matthew's request. The substance of

each doctor's analysis follows.[5]

     Dr. Bernier questioned Matthew's diagnoses of a reading disorder, anxiety disorder, and

ADHD. In his review of Dr. Baten's diagnostic reports submitted with Matthew's requests, Dr.

Bernier identified several deficiencies relating to her diagnosis of Matthew's reading disorder.

Specifically, Dr. Baten interpreted Matthew's WIAT test reading comprehension score as low

average, but Dr. Bernier explained that Matthew's score actually places him in the above average

range. Likewise, while Dr. Baten identified another reading comprehension test as placing

Matthew in the 20th percentile, Dr. Bernier explained that Matthew falls within the 20th

percentile only when compared to those who are completing their first year of college. He went

on to explain that the scaled score itself was average relative to the general population of older

teenagers and young adult readers from the general population used to standardize the test.

     Dr. Bernier also questioned Dr. Baten's diagnosis on the basis of score discrepancies. He

explained that a simple discrepancy in scores testing various skills does not necessarily indicate

---

[5] Each doctor reviewed Matthew's file multiple times and incorporated each prior
opinion into their later opinions. As a result, the Court will discuss each doctor's opinions as a
whole, rather than review each decision at each stage.

a disorder:

> One of the things is that when we look at a set of cognitive tests, a wide range of cognitive tests, you're going to expect some scatter, some variability in scores. And particularly the brighter an individual is, the more likely you are to find some variability; and for tests to differ in a significant, meaningful way, in folks of higher intelligence, the discrepancies have to be huge, very large to be meaningful. [ . . . ] It's a sort of myth that there is this uniformity of cognitive functioning. There isn't uniformity. People have strengths, they have weaknesses relative to themselves. But the issue here is are they weak relative to the general population of individuals. In this case while Mr. Healy did have a relative weakness in like working memory, his score was in the third quartile, the average to high average range, relative to the average person; so while that maybe is a personal weakness, in comparing him to the general population it's not a weakness.

Dr. Bernier agreed that Matthew may be "an imperfect reader," but he stressed that this weakness was relative. He noted that Matthew performed above average on his Stanford Achievement Test scores in sixth and seventh grade and on his college entrance examinations without accommodations. More weight should be accorded the results of these tests than the tests Dr. Baten conducted, according to Dr. Bernier, because these examinations more closely mimic the format and length of the COMLEX exam and, even more importantly, "the college admissions tests have become part of the experience of countless individuals from the general population and are not impervious to problems or disorders in reading, attention, or anxiety where these exist." Given this fact, Dr. Bernier concluded that "if the central objective of Title III is to provide equal access to written examinations, then the results of the middle school achievement tests and the college admissions tests would appear to indicate that there is no impediment to accessibility imposed by [Matthew's impairments]."

Dr. Bernier also questioned the doctors' diagnosis of anxiety. While Dr. Baten diagnosed

Matthew with an "Adjustment Disorder with Mixed Anxiety and Depressed Mood," Dr. Bernier explained that this a "transient" condition that "occurs in response to identifiable life stressors"" and is not considered "a serious psychiatric disorder or mental illness." With respect to Dr. Brewer, Dr. Bernier explained that test and social anxiety were mentioned, but the phenomenon Dr. Brewer documented failed to meet diagnostic criteria of any validated anxiety disorder. Finally, Dr. Bernier noted that, while Matthew's alcohol treatment center notes mention moderate anxiety, the successful, methodical, and pleasant person described in recommendation letters included in Matthew's medical school applications were inconsistent with someone who is disabled by social anxiety or any other anxious condition. Finally, Matthew's ADHD diagnosis was questioned by Dr. Bernier. Of significance to Dr. Bernier was the discrepancy in diagnoses between Dr. Baten and Dr. Brewer when Dr. Brewer initially saw Matthew only five months after Dr. Baten's second evaluation, at which time she had ruled out ADHD.

For his part, Dr. Murphy also questioned Matthew's diagnoses of ADHD and a reading disorder. Initially and on additional reviews, Dr. Murphy found that the documentation provided did not adequately substantiate these diagnoses. His conclusion was based in large part on the absence of a history of ADHD-symptoms and impairment via first-hand records (teacher reports, etc.), as opposed to mere conclusory self-reports of his diagnosis. According to Dr. Murphy, there was no indication in the materials submitted that Matthew struggled with symptoms of ADHD or a reading disorder during childhood, both of which he noted typically manifest during childhood. Dr. Murphy's report appears to be largely in agreement with Dr. Bernier's, as he notes Matthew's strong standardized test scores and errors in Dr. Baten's reports. Finally, Dr. Murphy suggested that possible alternative explanations for Matthew's problems may be "his

13

tending to be a perfectionist, adopting a test taking style that is slow and deliberate, test anxiety, or making a vocational choice (medical school) that may not be an ideal match for his personal pattern of strengths and weaknesses." Following repeated attempts at resolution, Matthew filed suit against NBOME on August 31, 2011, seeking injunctive relief requiring NBOME to provide him with accommodations during the May 23, 2012, examination.

## III. <u>DISCUSSION</u>

The ADA is not designed "to allow individuals to advance to professional positions through a back door. Rather, it is aimed at rebuilding the threshold of a profession's front door so that capable people with unrelated disabilities are not barred by that threshold alone from entering the front door." Jamie Katz & Janine Valles, *The Americans with Disabilities Act and Professional Licensing*, 17 Mental & Physical Disability L. Rep. 556, 561 (Sept./Oct.1993). It is with this mandate – to avoid opening the proverbial back door, while permitting capable people with unrelated disabilities to serve the community in professional capacities– in mind that the Court undertakes its inquiry.

### A. Disability

A person is disabled under the ADA when, *inter alia*, that person has "a physical or mental impairment that substantially limits one or more major activities of such individual." 42 U.S.C. § 12102(1)(A). There is a three-part test for determining whether a plaintiff is "disabled" under this section. First, the Court determines whether Matthew suffers from a physical or mental impairment. A mental impairment is "any mental or psychological disorder, such as an intellectual disability . . . , organic brain syndrome, emotional or mental illness, and specific

learning disabilities." 29 C.F.R. § 1630.2(h)(2). Matthew asserts that he suffers from mental impairments: a reading disorder, an anxiety disorder, and ADHD.[6]

If the Court determines that Matthew suffers from mental impairments, then the Court determines whether these impairments affect a major life activity. In making this determination, the Court determines whether the activity claimed by Matthew constitutes a major life activity under the ADA. In this case, Matthew argues that his disorders affect his ability to read, learn, think, and concentrate.

If the Court determines that Matthew's asserted activities constitute major life activities, the Court analyzes whether his impairments substantially limit those major life activities. *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 449 (7th Cir. 2001) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631-39 (1998)). In making this assessment, the Court may consider the condition, manner, and duration of the plaintiff's ability to perform a major life activity, including consideration of difficulty, effort, or time required, pain experienced, the length of time activity can be performed, and the way the impairment affects the operation of major bodily functions. 29 C.F.R. § 1630.2(j)(4)(i)-(iii). Importantly, "the focus is on how a major life activity is substantially limited, and not one what outcomes an individual can achieve." 29 C.F.R. § 1630.2(j)(4)(iv). Finally, the determination of whether a plaintiff's major life activity is substantially limited is made "without regard to the ameliorative effects of mitigating measures."

_____

[6] While Matthew has also been diagnosed with a disorder of written expression, he does not contend in his post-trial brief that this disorder warrants accommodation. This omission is prudent; while the evidence suggests that Matthew may indeed struggle with written expression, the COMLEX exam consists of multiple-choice questions, and Dr. Jed Magen of NBOME testified that the COMLEX does not purport to measure abilities to write or communicate. There is no evidence to suggest that Matthew's reading disorder may extend so far as to inhibit his ability to select and mark single-letter answers.

29 C.F.R. § 1630.2(j)(1)(vi). Here, Matthew asserts that his mental impairments substantially limit his ability to read, learn, think, and concentrate.

It is important to note at the outset that the "substantially limited" inquiry has been the subject of recent Congressional revision. In 2008, Congress amended the ADA "to carry out the ADA's objectives of providing 'a clear and comprehensive national mandate for the elimination of discrimination' and 'clear, strong, consistent, enforceable standards addressing discrimination' by reinstating a broad scope of protection to be available under the ADA." P.L. 110-325(b)(1). These amendments included significant changes to the "substantially limits" standard and expressly overruled the strict, demanding standard articulated by the United States Supreme Court in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002). Accordingly, the regulations now provide:

> (i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

> (ii) An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

> (iii) The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

> (iv) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to

16

require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA.[7]

29 C.F.R. § 1630.2(j)(1)(i)-(iii). With this standard in mind, the Court turns to its analysis.

*Step 1: Impairment*

With respect to Matthew's reading disorder, the Court is convinced that Matthew's reading speed scores, relative to his overall IQ and other skills, indicate that he does suffer from a reading disorder.[8] Dr. Bernier and Dr. Baten agreed as to the clinical definition of a reading disorder – "a significant discrepancy on reading skills measures/IQ measures, and also it includes that a person is reading at a level that wouldn't be expected for their educational background" – and the tests administered by Dr. Baten clearly establish this discrepancy with respect to Matthew. Furthermore, Matthew explained that, during middle school, he was cognizant of the fact that he was always the last one to turn in a test or assignment, and he

---

[7] Given that the new standard is defined relative to the old *Williams* standard, it is useful to articulate that standard before proceeding. *Williams* stood for the proposition that the ADA "precludes impairments that interfere in only a minor way with the performance of manual tasks from qualifying as disabilities." *EEOC v. AutoZone, Inc.*, 630 F.3d 635 (7th Cir. 2010). Furthermore, the pre-amendment regulations defined "substantially limited" as "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (2007).

[8] The Court rejects defense counsel's suggestion that, because Matthew could read his own essay aloud, this was evidence of his proficiency in reading. To draw this conclusion turns a blind eye to common sense: Matthew wrote this essay himself, meaning that, in writing this essay, he externalized his own thoughts – it is clear from this that he knew the content and could anticipate it before speaking the words. In addition, it is an imminently safe assumption to conclude that this was not the first time Matthew had read this essay, further increasing his ability to read the essay seamlessly.

suspected that this was because he read slower than his classmates.[9] This testimony further indicates Matthew's relative weakness in reading speed.

Dr. Baten's diagnosis of Matthew's anxiety is not as compelling. It is necessary at the outset for the Court to explain that it does not doubt that Matthew suffers from anxiety in social and testing situations; rather, the Court is simply unable to say that the evidence establishes by a preponderance of the evidence that Matthew's anxiety rises to the level of an impairment. What little evidence of anxiety is present in the record indicates only that Matthew suffers anxiety in ways common to many people. Dr. Baten explained that she based her diagnosis of anxiety on clinical interviews, and during these interviews, she noted Matthew "he had halting speech, raise [sic] in body temperature, sweating, shaking, and having difficulty retrieving words." But one can hardly expect a person to be calm when he is being closely scrutinized by an unfamiliar person in a foreign environment. Matthew also talked about "his difficulties in sitting down for tests and in approaching his work, that there would be high levels of anxiety" with Dr. Baten, and Dr. Brewer similarly opined that Matthew suffered from a social phobia "which has to do with fear of social or performance situations, whereby he may be subject to evaluation, criticism, embarrassment, and a difficulty of escaping from that circumstance," but again, these are reactions so many people experience. Furthermore, there is no indication that this test/evaluation anxiety manifests itself in his work, especially given his high test scores and his elite status as a figure skater. Other reports of Matthew's anxiety indicate specific stressors – making friends,

---

[9] Healy argues that his reading disorder is further supported by his early speech evaluations, which reported, at age four, "almost a year's difference between receptive and expressive language skills," and, at age eight, a "significant disparity between the verbal/performance ability." The Court finds nothing in these records that speaks to Matthew's *reading* ability; rather, these evaluations focus on Matthew's ability to express himself verbally.

dealing with sexual identity, adjusting to the demands of college, and coming to terms with family members – that are common to the human experience. Dr. Bernier explained that this kind of stress is considered "transient" and does not qualify as a psychiatric illness.

It may be that Matthew holds himself to such a high standard that experiencing anxiety in these situations is personally unacceptable to him, for it is clear that Matthew is a highly-driven individual who seeks not only to maximize his own potential, but also to aide others in their pursuit as well. Matthew's work as a Special Olympics figure skating coach is just one example of this. It may also be that the experience of anxiety in certain social and academic settings is especially jarring given his clearly demonstrated ability to succeed in other areas. Yet the Court has searched the record for instances in which Matthew's anxiety has impaired his functioning in any way that supports the doctors' diagnosis, but instead the Court has found example after example of Matthew's ability to function – nay, succeed – in high pressure environments that would surely rattle others among us. Matthew's membership on the national and international figure skating teams is but one instance of his ability to succeed in a test-like environment; his above-average SAT score is another. The glowing recommendations of Matthew's skating coaches and professors further suggest a person who, albeit reserved, is not functionally impaired in a social setting. For this reason, the Court is unable to find that Matthew suffers from anxiety that rises to a level cognizable as a mental impairment under the ADA.

Finally, the Court does not credit Dr. Brewer's diagnosis of ADHD. While the Defendants make much of the fact that Matthew's diagnosis was first made when he was an adult, the Court does not rely on this fact for its decision. Given Matthew's unique school situation – juggling figure skating with Montessori school, private tutoring, and spending a

reduced amount of time actually present in the high school environment due to training demands – it is certainly possible that Matthew "fell through the cracks," in Dr. Baten's words. Rather, it is the underlying dearth of data supporting Dr. Brewer's diagnosis that undermines it. As Dr. Murphy explained, "Dr. Brewer indicated his ADHD diagnosis was based on Mr. Healy's personal recall and his mother's report. This is not sufficient. We don't know what assessment measures Dr. Brewer used, which or how many of the DSM-VI symptoms of ADHD he endorsed currently or during childhood, what the nature or magnitude of any impairment he experienced was, and Dr. Brewer simply did not build an adequate case to justify the diagnostic conclusion of ADHD."[10] Dr. Brewer admitted that he based his diagnosis on only Matthew's and his mother's reports and acknowledged this shortcoming himself: "I accept the fact and am personally embarrassed that I did not record information more thoroughly and comprehensively. That is a deficiency of me in the prospect of a busy practice and accommodating so many hurting people." It may be that Dr. Brewer's experience and knowledge is sufficient to justify minimal record-keeping in the context of providing treatment to his patients, but there is no dispute that it is insufficient to justify formal recognition of a clinical diagnosis. For this reason, the Court is unable to find that Matthew suffers from ADHD cognizable under the ADA.

*Step 2: Major Life Activities*

---

[10] The Court notes that Dr. Brewer testified at his deposition that he evaluated Matthew based on the DSM guidelines when he concluded that Matthew had ADHD, but its not clear whether this assessment occurred contemporaneously with Matthew's diagnosis or was later developed with the benefit of hindsight and in preparation for his deposition.

Having found that Matthew suffers from a reading disorder, the Court turns to the question of whether this disorder substantially limits a major life activity. Matthew asserts that his impairment affects his ability to learn, read, think, and concentrate. The Code of Federal Regulations explicitly lists learning, reading, thinking, and concentrating as major life activities. 42 U.S.C. § 12102(2)(A). The parties do not dispute this conclusion, and the Court accepts it for the purposes of the following analysis.

*Step 3: The "Substantially Limited" Inquiry*

Whether a person is substantially limited in a major life activity is measured by comparison to most people in the general population. When assessing whether major life activities are substantially limited, courts have considered the plaintiff's objective test results as compared to the average person, *Rumbin v. Assoc. of Am. Med. Colls.*, 803 F. Supp. 2d 83, 94 (D. Conn. 2011), the plaintiff's other activities, including extracurriculars, *id.* at 95, whether there exists a pattern of substantial academic difficulties, *Price v. Nat'l Bd. of Med. Exam'rs*, 996 F. Supp. 419, 423 (S.D.W.Va. 1997), and whether the plaintiff has been afforded testing accommodations in the past, *Gonzalez v. Nat'l Bd. of Med. Exam'rs*, 60 F. Supp. 2d 703, 708 n.1 (E.D. Mich. 1999).

In this case, Matthew argues that his abilities to learn, read, think, and concentrate are substantially limited compared to most people in the general population. The Court finds little evidence to support this assertion and much to refute it. Dr. Baten testified that a standardized administration of the exam would not accurately reflect Matthew's aptitude because his reading disability would affect his test-taking ability. For the purposes of this analysis, the Court will assume that the major life activities of learning, reading, thinking, and concentrating are

subsumed under the umbrella of test-taking. However, when viewed in this light, Dr. Baten's

testimony establishes that Matthew may have a relative personal weakness when it comes to

these areas, which weakness results from his reading disability, but her testimony clearly

establishes that he is not substantially limited when compared to the general population. She

explained that "[h]is reading process is quite slow as compared to his IQ. I believe it's average to

low average throughout the testing." By definition, "average" is not "substantially limited." To

find otherwise would be to give credence to sort of illusory inferiority, a notion demonstrated by

a situation in which roughly 75% of people believe themselves to be of below-average

intelligence.

Dr. Baten then goes on to explain the difference between a clinical disability and a

disability under the ADA, which was also similarly expressed by Dr. Bernier.

Q.           Would you agree that it's common for people to have relative
             strengths and weaknesses in certain areas of cognitive abilities?

Dr. Baten:   Yes.

Q.           And variability in index scores in itself does not indicate a learning
             disability?

Dr. Baten:   Variability does indicate a learning disability if there's a statistical
             – if there's a certain number of standard deviation difference
             between aptitude and achievement.

Q.           Would it be a disability if it was still above what the average
             person can do?

Dr. Baten:   Yes.

In other words, a person may exhibit statistically significant variation in test scores sufficient to

support a clinical diagnosis, but this diagnosis is based on an internal referrant. When the test

scores are compared to an external referrant as the ADA requires – that is, the general population – that person may nevertheless exhibit average abilities.

An absence of limitation as compared to the general population is further demonstrated by Matthew's stellar academic record, the majority of it achieved in the absence of accommodations.[11] Matthew received high grades throughout elementary, middle, and high school. It is true that Matthew attended a Montessori school and received additional time to complete some assignments in an effort to accommodate his figure skating training schedule. In this way it may be difficult to assess whether the additional time afforded him the ability to self-accommodate for an otherwise-substantially limiting reading disability. In addition, Matthew's college essay evidences Matthew's determination in self-accommodating his expressive speech disorder and speaks to his desire to avoid having exceptions made for him. It may be that Matthew successfully compensated for his reading disability at this time as well. However, putting aside these scores as the ADA requires, Matthew's above-average standardized testing scores, ACT scores, and SAT scores, during which he received no accommodation, still stand as testament to his ability to read, learn, think, and concentrate just as well, if not better, than the general population.[12]

_____

[11] The Court notes that Matthew was afforded accommodations at NYU, on the MCAT, and at Touro. Here, the Court finds significant the test scores achieved without accommodations themselves, not the fact that Matthew's elementary, middle, and high schools did not afford him accommodations.

[12] This conclusion is further bolstered by Matthew's college essay reflecting on language. At a time when Matthew was openly and honestly reflecting on his abilities, he never mentions difficulty reading; the focus of this essay is Matthew's ability to express himself verbally and in writing.

With respect to Matthew's test scores, the Court agrees that "[a] definition of disability based on outcomes alone, particularly in the context of learning disabilities, would prevent a court from finding a disability in the case of any individual . . . who is extremely bright and hardworking, and who uses alternative routes to achieve academic success," a result inconsistent with the goals of the ADA. *Bartlett v. New York State Bd. of Law Exam'rs*, 2001 WL 930792 at *7 (S.D.N.Y. 2001) (Sotomayor, J.). However, unlike the plaintiff in *Bartlett*, Matthew has provided scant evidence as to the methods he employs to cope with his reading disability. *Id.* at *39 (plaintiff took test prep course which taught her the "hit and move on" reading strategy, had classmates read to her, participated in study groups, choose classes that were graded based on term papers rather than timed exams, and "avoided reading at all costs"). The little evidence he has provided as to how he took tests– that he "skimmed" the questions on the COMLEX but still looked at every word – does not suggest efforts to overcome a substantial limitation, given that every timed test forces "skimming" to some degree. In addition, the Court heard other evidence about Matthew's coping mechanisms, specifically, that he would rewrite his notes from class to aid his discussions with his professors, but at best this suggests coping mechanisms with respect to his disorder of written expression, not his reading disability. More realistically, this simply describes good study habits. The Court finds no evidence of coping mechanisms undertaken to account for a substantially-limiting disorder. For these reasons, the Court finds that Matthew's reading disorder does not substantially limit his abilities to read, learn, concentrate, and think, as compared to the general population.

**B. Accommodation**

Because the Court finds that Healy is not disabled within the meaning of the ADA and thus is not entitled to accommodations, it need not address the reasonableness of his requests.

## IV. CONCLUSION

Plaintiff Matthew Healy is clearly a gifted and driven individual. While he may struggle with what he considers to be personal weaknesses, his reading disorder does not substantially limit major life activities as compared to the general population. As such, he is not disabled under the ADA. To find otherwise would be to open the proverbial back door of the medical profession to Matthew. In so holding, the Court does not slam both the front and back doors in Matthew's face; rather, the Court leaves the front door of the medical profession open. The Court is certain that, given Matthew's drive and talent, this is but one of many doors standing open for him.

For the foregoing reasons, the Court finds in favor of the Defendant National Board of Osteopathic Medical Examiners. Plaintiff Matthew Healy's request for an injunction is **DENIED**.

SO ORDERED:   05/03/2012

_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic communication

25