1                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF INDIANA

2                  INDIANAPOLIS DIVISION

3

   MATTHEW HEALY,           )

4                       )
                      ) CAUSE NO.

5       Plaintiff,     ) 1:11-cv-01184-WTL-DML
                      )

6       -vs-            )
                      ) Indianapolis, Indiana

7    NATIONAL BOARD OF     ) April 19, 2012
   OSTEOPATHIC EXAMINERS, INC.,) 9:00 a.m.

8                       ) VOLUME 1
      Defendant.     )

9

10

11                   **BEFORE THE**
          **HONORABLE WILLIAM T. LAWRENCE**

12

13         OFFICIAL REPORTER'S TRANSCRIPT OF

14               BENCH TRIAL

15

16

17

18

19   Court Reporter:   Cathy Easley Jones, RPR, FCRR
                  Official Court Reporter

20                   46 East Ohio Street, Room 291
                  Indianapolis, IN  46204

21

22

23

24

25       PROCEEDINGS TAKEN BY MACHINE SHORTHAND
        COMPUTER-AIDED TRANSCRIPTION

2

1                      **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:          Mr. Andrew Dutkanych
                                 BIESECKER DUTKANYCH & MACER
4                                411 Main Street
                                 Evansville, IN  47708
5
     FOR THE DEFENDANT:          Ms. Kristen M. Carroll
6                                Mr. Robert M. Kelso
                                 KIGHTLINGER & GRAY
7                                One Indiana Square
                                 Suite 300
8                                Indianapolis, IN  46204

9
     FOR THE DEFENDANT:          Mr. Sydney L. Steele
10                               KROGER GARDIS & REGAS
                                 111 Monument Circle
11                               Suite 900
                                 Indianapolis, IN  46204
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X   O F   W I T N E S S E S

                                                    PAGE

MATTHEY HEALY
Direct Examination by Mr. Dutkanych ............13
Cross-examination by Mr. Kelso ................36
Redirect examination by Mr. Dutkanych .........52

NANCY HEALY
Direct Examination by Mr Dutkanych ............55
Cross-examination by Ms. Carroll ..............61

1       *(In open court)*

2             THE COURT:  I think we're about to begin after some

3    technical glitches.

4             We are on the record on Cause

5    No. 1:11-cv-1184-WTL-DML, Matthew Healy versus National Board

6    of Osteopathic Medical Examiners.

7             Good morning, Mr. Dutkanych.  How are you?

8             MR. DUTKANYCH:  Good morning, Your Honor.

9             THE COURT:  Would you introduce who's with you this

10   morning?

11            MR. DUTKANYCH:  On the end is Lauren Berger, an

12   attorney with my firm; and this is Matthew Healy, the

13   plaintiff.

14            THE COURT:  Good morning to each of you.

15            Ms. Carroll, how are you?

16            MS. CARROLL:  Good morning, Your Honor.

17            THE COURT:  Are you doing the heavy lifting today?

18            MS. CARROLL:  I am, Your Honor.

19            THE COURT:  Would you introduce that distinguished

20   panel that you have with you?

21            MS. CARROLL:  I will, Your Honor.  My partner, Bob

22   Kelso; Sydney Steele, counsel for NBOME; Dr. Magen,

23   representative of NBOME.

24            THE COURT:  Good morning.  Matter comes on for trial

25   to the Court.  Are both sides ready to proceed?

1   Mr. Dutkanych?

2          MR. DUTKANYCH:  Plaintiffs are ready to proceed,

3   Your Honor.

4          THE COURT:  Ms. Carroll?

5          MS. CARROLL:  Yes, Your Honor.

6          THE COURT:  All right.  I think when we had our

7   final pre-trial, it was suggested that we allow some time for

8   opening statements.  Mr. Dutkanych, do you wish to avail

9   yourself of that opportunity?

10          MR. DUTKANYCH:  Yes, Your Honor.

11          THE COURT:  As far as I'm concerned, you may begin.

12   I would ask that all the examinations as well as anything

13   other than just quick objections, if there are any, be made

14   from the podium.

15          MR. DUTKANYCH:  Your Honor, Mr. Healy is seeking an

16   accommodation to take the COMLEX Level 1 Exam.  In order to be

17   entitled to an accommodation under the ADA, the evidence must

18   demonstrate that he is a disabled individual as defined by the

19   act and the accommodations that he is requesting are

20   reasonable.

21          There will be ample evidence that Mr. Healy suffers

22   from an impairment.  The Court will hear evidence that

23   Mr. Healy suffers from a reading disorder as diagnosed

24   appropriately by Dr. Amanda Baten.  There will also be

25   evidence that he suffers and was diagnosed with an anxiety

1   disorder and ADHD by both Dr. Amanda Baten and Dr. Charles

2   Brewer.

3          But Your Honor, there is more than just the

4   conclusions of these two professionals.  The evidence will

5   demonstrate that Mr. Healy has struggled with his reading

6   disorder his entire life.  Nancy Healy, Mr. Healy's mother,

7   will testify to the difficulties that he had during the

8   developmental years and adolescence.  The evidence will show

9   that when he was four years hold, he was evaluated by a speech

10  pathologist.  During that evaluation, it was noted that he had

11  expressive speech development that was slow, that he was prone

12  to throwing tantrums due to frustrations with his speech; and

13  the evaluation noted that there was almost a year's difference

14  between receptive and expressive language skills and a

15  weakness in rote memory.

16         When he was eight years old, he was referred by his

17  school for another evaluation.  This report will show that

18  there were concerns again with his becoming frustrated with

19  his school work and a need to evaluate his reading skills.

20         Mr. Healy was not diagnosed with a specific learning

21  disability at that time.  However, the evaluation did show

22  that a significant disparity existed between Mr. Healy's IQ

23  and his verbal performance ability.  Your Honor, you will hear

24  that there is no dispute that it is this type of disparity

25  that defines whether an individual has a reading disorder; and

1  it was this type of disparity that led Dr. Baten to conclude

2  that Mr. Healy had a reading disorder.

3         Your Honor, Mr. Healy will testify to the existence

4  and effects and his condition throughout his childhood.

5  Mr. Healy is a unique individual, and he had a unique

6  upbringing.  He was a figure skater who competed both

7  nationally and internationally throughout his childhood.  As a

8  result, Mr. Healy's primary and secondary schooling never

9  existed under standardized conditions.

10         You will hear evidence that Mr. Healy attended the

11  Montessori school for his primary education, which was a

12  one-on-one environment and allowed him to learn at his own

13  pace.  You will hear testimony that in middle school and high

14  school, Mr. Healy was allowed extra timing to complete

15  assignments and examinations and, for the most part, was

16  allowed to continue to learn at his own pace.

17         At the same time, when he was in the classroom, you

18  will hear evidence that Mr. Healy recognized that he was

19  always the last to finish exams and assignments, that he often

20  had to come back at lunch to complete those or after school.

21         You will hear evidence that Mr. Healy had difficulty

22  finishing standardized tests that were administered.  You will

23  hear evidence that Mr. Healy felt easily distracted and had

24  difficulty concentrating in the classroom setting.

25         Nevertheless, with his persistence and those

1   informal accommodations that he was provided, the evidence

2   will show that Mr. Healy recorded high grades throughout

3   school.  Still, Mr. Healy's condition persisted.  The evidence

4   will show that Mr. Healy was unable to finish the SAT exam

5   each of the three times he sat for it.  With that said, he

6   still scored well; but you results of that test did not

7   reflect his true aptitude.

8          In 2001, Mr. Healy stopped skating competitively and

9   began attending New York University on a full-time basis.  At

10  NYU for the first time, Mr. Healy was without the informal

11  accommodations that allowed him to navigate his way through

12  his primary and secondary schooling.  Thus, for the first

13  time, Mr. Healy was working under standardized conditions; and

14  the evidence will show that Mr. Healy could no longer overcome

15  the limits that his condition placed on him.

16         The evidence will show that Mr. Healy sought formal

17  accommodations for the first time through the Moses Center at

18  NYU.  He was referred to Dr. Baten; and based on an interview,

19  previous medical records and a battery of tests, she concluded

20  that Mr. Healy had a reading disorder.  Specifically, the

21  results demonstrated that he reads and processes information

22  slowly.  The evidence will show that based on her evaluation,

23  NYU provided Mr. Healy with double time and a private setting

24  to take examinations.  With these accommodations, Mr. Healy

25  successfully graduated from NYU.

1          After graduating, Mr. Healy aspired to go to medical

2    school.  The evidence will show that Mr. Healy sought and was

3    approved by the Association of American Medical Colleges to

4    take the MCAT with the same accommodations, double time and in

5    a private setting.  The Association of American Medical

6    Colleges required that Mr. Healy be evaluated a second time;

7    and based on a second evaluation done by Dr. Baten in

8    November 2006 that confirmed that Mr. Healy had a reading

9    disorder and anxiety disorder, he was approved to take the

10   MCAT a second time with the same accommodations, double time

11   and a private setting.

12          He scored well enough on the MCATs to be admitted at

13   Touro College of Osteopathic Medicine or as you'll hear it

14   referred to today, TouroCOM.  At TouroCOM, the evidence will

15   show that Mr. Healy again sought and was approved for the same

16   formal accommodations he had received from NYU and the

17   Association of American Medical Colleges.

18          With this accommodation, he has successfully completed

19   his first three years of medical school.  Mr. Healy must pass

20   the COMLEX Level 1 Exam before entering the fourth year of

21   medical school, which consists of clinical rotations.  He is

22   seeking the same reasonable accommodations that were provided

23   by NYU, the Association of American Medical Colleges and

24   TouroCOM, ostensibly, the same accommodations or type of

25   accommodations that he received throughout primary and

1    secondary schooling.

2          We contend, Your Honor, that the evidence will

3    demonstrate that Mr. Healy suffers from an impairment that

4    substantially limits his ability to read, concentrate and

5    think and that the accommodation that he seeks will allow his

6    true aptitude to be tested by the COMLEX Level 1.

7          We contend that the evidence will demonstrate that

8    Mr. Healy is entitled to an accommodation under the ADA.

9    Thank you.

10          THE COURT:  Thank you, Mr. Dutkanych.

11          Ms. Carroll.

12          MS. CARROLL:  Thank you, Your Honor.

13          Good morning.  Although Matthew may have had

14    problems with some tasks, the evidence that will be presented

15    before this Court will establish no impairment that rises to

16    the level of a disability under the ADA.  It is undisputed

17    what that standard is as is compared to most people in the

18    general population.

19          As a gatekeeper for those entering the practice of

20    medicine, NBOME's obligation is to the public and maintaining

21    the integrity of the examination while complying with the law.

22    The Test Accommodations Committee, which is compiled of a

23    group of physicians, based upon their obligation review

24    applications on a case-by-case basis.

25          In this case they reviewed -- carefully reviewed all

1  documentation submitted to NBOME by plaintiff but denied his

2  request.  Dr. Bernier, a specialist in neuro-psych

3  evaluations, and Dr. Murphy, who is an expert in ADHD, will

4  testify that the totality of the evidence does not

5  substantiate a mental impairment.

6       It is undisputed that the type of learning

7  disabilities alleged by Mr. Healy are lifelong conditions,

8  with onset of signs and symptoms in childhood.  What the

9  evidence in this case will demonstrate is that Matthew had a

10  stellar academic history.  He was top of his class from

11  elementary school all the way to the first year of college.

12  The timed standardized tests similar to the COMLEX 1, all of

13  his test results were above the national average.

14       The examination that plaintiff indicated at age

15  eight diagnosed no reading disorder.  In fact, at that time,

16  it was noted that he was developmentally on course with the

17  same-aged peers.  There was no evaluation for 13 years.  At

18  that time, he was evaluated by Dr. Baten -- by Amanda Baten.

19  At that point, it was for the purpose of receiving test

20  accommodations in his second year of college after he switched

21  to pre-med.

22       Although some relative weaknesses, the overall

23  results of Dr. Baten's neuropsychological tests indicate

24  Matthew Healy's intellectual and academic achievement level

25  was above the average as compared to most people in the

1   general population.

2          What the evidence will demonstrate as to Matthew

3   Healy's ADHD is in addition to his illustrious academic

4   career, there was no developmentally deviant, behavioral,

5   intellectual or emotional issues.  There was no diagnosis of

6   ADHD by Amanda Baten during the course of her treatment

7   between 2002 through 2006.  In fact, Matthew nor his mother

8   endorsed any symptoms consistent with ADHD diagnosis; and his

9   results were well below the cutoff.

10          This is same for when he saw Dr. Brewer two months

11  later.  There was no indication that he met any -- the minimum

12  criteria for an ADHD diagnosis.  Yet, Dr. Brewer will testify

13  that he rendered this diagnosis without any further testing or

14  validation by review of any historical documentation.

15          Finally, Matthew sought counseling for adjustment

16  issues when he went from his ice-skating career into college

17  at an older age, personal and family issues and difficulty

18  getting into medical school.  But there will be no evidence

19  presented to this Court of a condition that rises to the level

20  of a disability under the ADA.

21          The evidence presented to this Court, in fact, will

22  establish that Matthew has no mental or physical impairment

23  that rises to the level of disability and that it

24  substantially limits a major life activity as compared to most

25  people in the general population that would warrant NBOME

1  accommodating and the Court allowing accommodation for Matthew

2  Healy for the COMLEX 1 -- Level 1 examination.  Thank you.

3         THE COURT:  Thank you, Ms. Carroll.

4         All right.  Mr. Dutkanych, are you at this point

5  wishing to call witnesses this morning?

6         MR. DUTKANYCH:  Yes, Your Honor.

7         THE COURT:  You may call your first.

8         MR. DUTKANYCH:  I would like to call Matthew Healy.

9         THE COURT:  Would you raise your right hand, sir.

10     *(Witness sworn.)*

11        THE COURT:  Be seated, please.  If you will scoot up

12  just a little bit closer to the microphone.

13        Mr. Dutkanych, you may inquire.

14              **MATTHEW HEALY, PLAINTIFF'S WITNESS, SWORN**

15                     **DIRECT EXAMINATION**

16  BY MR. DUTKANYCH:

17  Q   Mr. Healy, please state and spell your name for the

18  record.

19  A   My name is Matthew Healy, M-A-T-T-H-E-W H-E-A-L-Y.

20  Q   Mr. Healy, why have you brought this lawsuit against the

21  National Board of Osteopathic Medical Examiners?

22  A   Because I have been denied accommodations for the COMLEX

23  exam.

24  Q   What is the COMLEX Level 1 exam?

25  A   It is an exam that is for medical students somewhere

1  between the second and third years that's taken –– that's

2  needed before starting the fourth year of medical school.

3  Q    What was the accommodation that you were seeking to take

4  the exam?

5  A    Double-time accommodations with –– in a private and quiet

6  setting.

7  Q    Why did you feel you needed this accommodation?

8  A    Based off of my past neuropsych testing and that I have

9  had these accommodations in the past.

10  Q    Do you contend that you have a learning disability?

11  A    Yes.  I do have a learning disability and ADHD and

12  anxiety.

13  Q    Could you describe for the Court the nature of your

14  learning disability?

15  A    I read much slower than average.  I am slower with

16  processing.  I take a long time to do my assignments.

17  Q    Could you describe for the Court the anxiety from which

18  you suffer?

19  A    In both social and academic situations, I become quite

20  anxious when I have to explain myself or tell a story.

21  Q    Could you describe how your ADHD affects you?

22  A    I become easily distracted and have difficulty maintaining

23  focus, especially when I become anxious and when I have to

24  perform tasks.

25  Q    How do these conditions affect your ability to take the

MATTHEW HEALY – DIRECT/DUTKANYCH                    15

1    COMLEX Level 1 exam under standard conditions?

2    A   Can you say that again, please?

3    Q   Sure.  How do these conditions affect your ability to take

4    the COMLEX Level 1 exam under standard conditions?

5    A   I was very rushed for time.  I basically just read through

6    the questions and answered as quickly as I could.  I didn't

7    have any time to think about how I was answering.  And this

8    also led to being anxious trying to get through the exam and

9    having difficulty concentrating and staying on task during

10   that time.

11   Q   Have you always had difficulty reading and processing

12   information?

13   A   Yes, I have.

14   Q   When do you first recall difficulties learning?

15   A   I remember being frustrated in grade school.  The first

16   time that I actually found out that I have a learning

17   disability was in the car with my mom when I was in 7th grade,

18   and I was telling her that I had trouble saying the months in

19   order.  She said that that didn't surprise her; that when I

20   was young, I had the same trouble with numbers and letters and

21   that I have a learning disability.

22   Q   Where did you go to school between kindergarten and fifth

23   grade?

24   A   Montessori.

25   Q   Can you describe for the Court the educational philosophy

1   at the Montessori school?

2   A   It's individualized instruction.  It allows students to

3   work at their own pace, and there's a lot of one-on-one

4   teaching.

5   Q   If you could open the exhibit binder next to you to

6   101-04, page 34.  Can you identify this document for the

7   Court?

8   A   It's an evaluation by my art teacher, Judy Mercer, when I

9   was a student at Montessori.

10                  MR. DUTKANYCH:  Your Honor, it's page 34.

11                  THE COURT:  Beg your pardon?

12                  MR. DUTKANYCH:  Page 34.

13  BY MR. DUTKANYCH:

14  Q   Mr. Healy, can you read for the Court the section under

15  "Needs Improvement"?

16  A   Yes.  "He's not very attentive during instruction.  Seems

17  distracted by those around him.  If he stays focused, projects

18  get done.  Needs to be more attentive with cleanup.

19       "4-29, much improved."

20  Q   Is distractibility something you continue to struggle

21  with?

22  A   Yes, it is.

23  Q   If you would look at the next page, page 35 of that

24  exhibit.  Can you read the comment at the bottom of the page?

25  A   "Matthieu is very serious and methodical about his work.

1    He achieved a lot this year.  Great progress."

2    Q   Are you methodical about your work?

3    A   Yes, I am.  I take my time and I'm slow.

4    Q   Now, where did you attend middle school?

5    A   Northwood Middle School.

6    Q   Did you recognize any issues with your reading disorder

7    while in middle school?

8    A   I recognized reading slower than my other schoolmates and

9    taking a longer time to finish assignments and finish tests.

10   Q   Did this affect your grades in middle school?

11   A   No, it did not.

12   Q   Why do you believe it didn't affect your grades?

13   A   Because I had the time to complete the assignments and the

14   school work with informal accommodations that I was able to

15   work out with my teachers.

16   Q   Were you involved in any extracurricular activities during

17   middle school?

18   A   Yes, I was.  I used to competitively figure skate.

19   Q   Can you briefly describe for the Court your involvement

20   with figure skating?

21   A   Yes.  I was competitive figure skater -- well, actually I

22   started skating when I was four to age seven.  I had to quit

23   for a portion of time and started back when I was ten; and at

24   that time, I started training more seriously for competition.

25   Q   Did you compete on the national level?

1  A    Yes.  I competed nationally and internationally.

2  Q    Now, did your reading disorder affect your ability to

3  skate?

4  A    No.  I didn't have to read to skate.

5  Q    What about your anxiety disorder?

6  A    No, because by the time competition came around, I would

7  have been trained well enough to just do the performance, just

8  go on auto pilot and to skate.  It was when thinking, that

9  would become the issue.

10 Q    How did your skating work while you were in middle school?

11 How did it affect the schedule?

12 A    I skated before school and after school, and I had several

13 competitions throughout the year where I would miss some

14 school time.

15 Q    During middle school, were you provided with additional

16 time to complete assignments?

17 A    Yes.  With how much school I missed, I was allowed extra

18 time to make up assignments and to -- I worked out a time with

19 my teachers when to take an exam that I missed.

20 Q    Where did you go to high school?

21 A    I went to three different high schools.

22 Q    Where was the first high school you went to?

23 A    Lawrence North.

24 Q    Is that here in Indianapolis?

25 A    Yes, it is.

1   Q    What brought you to Indianapolis?

2   A    Figure skating, to train more seriously.

3   Q    Did you have a regular high school schedule while you

4   attended Lawrence North?

5   A    No, I did not.  I only attended for core courses, and the

6   rest of my -- the rest of my credits were for performing arts

7   classes that I got with my skating.

8   Q    Did your reading disorder affect you in high school?

9   A    Yes, it did.  I always took longer reading, finishing

10  assignments, finishing tests.  I -- sorry.  I lost my train of

11  thought.

12  Q    Okay.  Did you receive any accommodations during high

13  school?  Were your teachers understanding?

14  A    Yes.  They were understanding.  They knew that I was

15  seriously training and was an elite athlete, and they made

16  concessions.  So, I was allowed leniency as far as when I

17  would turn in work and when I would take exams.

18  Q    Were you provided with additional time to complete your

19  assignments?

20  A    Yes, I was.

21  Q    Did you ever come back at lunch or after school to

22  complete assignments?

23  A    Yes.  I frequently would go during lunch and after school

24  and either finish an exam or finish an assignment.

25  Q    Did your anxiety affect you in high school?

1  A   It did, and it always has as far as when I would take

2  longer to complete an assignment; and there were other

3  students that were obviously finished and obviously working

4  faster; and I would become anxious and embarrassed, and it was

5  difficult to concentrate and stay on task to answer the

6  questions that I needed to.

7  Q   How long did you attend Lawrence North?

8  A   Just for one year.

9  Q   Where did you go to high school after that?

10  A   Cardinal Ritter.

11  Q   How long did you attend Cardinal Ritter?

12  A   Two years.

13  Q   That's here in Indianapolis as well, right?

14  A   Yes, it is.

15  Q   Did you receive the same types of leniency from Cardinal

16  Ritter's faculty as you received from Lawrence North?

17  A   Yes, I did.

18  Q   Where did you graduate from high school?

19  A   I graduated from Cheyenne Mountain High School.

20  Q   Where is that located?

21  A   In Colorado Springs.

22  Q   What brought you to Colorado Springs?

23  A   Figure skating.

24  Q   Did you take traditional classes there?

25  A   No, I did not.  I only took tutored courses.

1  Q   And working with a tutor, were you allowed to complete

2  assignments at your own pace?

3  A   Yes.  I was able to work at my own pace and take whatever

4  time I needed to complete an exam.  It was -- there was a lot

5  of leniency to that.

6  Q   During high school, did you take any standardized tests?

7  A   I'm sorry.  Can you repeat it?

8  Q   Sure.  During high school, did you take any standardized

9  tests?

10  A   Yes.  I took the ACT, and I took the ACT (sic).

11  Q   How many times did you take the ACT?

12  A   I took it twice.

13  Q   How did you do?

14  A   I believe I did all right.

15  Q   Did you finish the exams?

16  A   No -- sorry.  No, I didn't.

17  Q   What about the SAT?  How many times did you take that

18  exam?

19  A   I took that exam three times.

20  Q   Did you have any difficulty with that exam?

21  A   I did.  I never finished the portions of the SAT.

22  Q   Do you remember what your scores were on the SAT?

23  A   The range was between a 1080 and 1150, I believe.

24  Q   How would you characterize those scores?

25  A   Slightly above the national average, but it really didn't

1   show what I was capable of because I was never able to finish

2   reading the exam.  I couldn't finish the questions.

3   Q    Did you seek an accommodation for the SAT?

4   A    No, I did not.

5   Q    After high school, where did you attend college?

6   A    New York University.

7   Q    In what year did you matriculate at NYU?

8   A    The fall of 2001.

9   Q    What was your major during your first year?

10  A    Sports management.

11  Q    Now, when you entered NYU, were you still skating

12  competitively?

13  A    No, I was not.

14  Q    Had you completely stopped skating competitively at that

15  point?

16  A    Yes, I did.  I was only focusing on my academics at that

17  point.

18  Q    How were your grades during your first year?

19  A    They were good, As and Bs.

20  Q    I'm going to have you look at Exhibit 101-12, page 186.

21  Mr. Healy, what is this document?

22  A    This is a writing assignment from my second semester of my

23  freshman year.

24  Q    At the time that you wrote this assignment, had you

25  requested a formal accommodation?

1   A    No, I had not.

2   Q    You had not requested a formal accommodation from NYU?

3   A    No, I had not.

4   Q    Mr. Healy, can you read this essay for me?

5   A    Yes.

6         "As a child, my language skills were late to develop.

7   I understood far more far earlier than I was able to

8   communicate.  I was able to follow directions at a very young

9   age, but I could not talk.  When I did start talking, I was

10  difficult to understand.  My family could understand what I

11  would say but strangers did not.  This difficulty with speech

12  and language from when I was young is indicative of how I

13  learn and what language is for me even today.

14        "Because of delayed expressive speech, I had speech

15  and language evaluations in April of 1984 and a year later in

16  1985.  Initially, I revealed a weakness in the development of

17  intelligible speech and in oral motor planning.  I was

18  subsequently seen in speech therapy and discharged the next

19  year after being tested again in 1985.  I scored from

20  exceptionally high to above average on intelligence tests, but

21  the range in these scores was significant.  Any test that

22  involved finding order, such as putting a picture story in

23  order, I scored lower on.  From when I was two and a half to

24  three years old, I knew all of my numbers and letters of the

25  alphabet; but I could not say them in order.  Any letter or

MATTHEW HEALY – DIRECT/DUTKANYCH                 24

1  number could be pointed to, and I would answer correctly; but

2  if I was asked to say them in order, I was not able.

3      "I was tested again when I was eight years old by the

4  recommendation of my teachers at the time in 1989.  The woman

5  who tested me remarked that she had never seen such a

6  discrepancy in score levels.  This explained why I would

7  become frustrated at times in grade school.  I would have

8  difficulty understanding a concept that wouldn't necessarily

9  be complex; but the way my brain was functioning, the concept

10 was hard to grasp.  Since all of the subtests were in the

11 above average range or higher, it suggested I would not have

12 any difficulty in those processing areas as compared to the

13 typical child age in the classroom.

14      "But it was the discrepancy in the scores that would

15 lead to be frustrating for me.  Since there was such a range

16 in my scores, it showed that my brain worked at different

17 speeds.  I am able to process thoughts faster than I am able

18 to communicate them.  When trying to communicate the original

19 thoughts, I am processing new ones, constantly rethinking what

20 I am saying.

21      "What I have found to be significant is the

22 correlation between being able to order and space things

23 correctly with the ability of speech and language.  It wasn't

24 until the other day that I discovered the relationship between

25 the two.  I realized when writing, I had problems with

1   organization; but I didn't realize that with thought, I had

2   difficulty with it as well.

3        "I never included this problem I had into everyday

4   life as I mentioned earlier.  No exceptions were needed to be

5   made for me.  So I dealt with my problems unconsciously, not

6   completely realizing I processed information differently.

7        "I realize that with having difficulty in being able

8   to order things logically, my ability to form sentences and

9   paragraphs also is affected.  If I try to write an essay on

10  paper, I am constantly scratching out my mistakes to reword

11  what I am trying to say.  The order of my paragraphs has to be

12  reworked to be made sense of.

13       "I did not understand why this was; but seeing the

14  relation between when I was young and now, I see why, and I

15  feel better having a better understanding of myself.  I can

16  even make sense of the difficulty I have when I am called on

17  to answer a question and put on the spot.  I even know now why

18  I have some difficulty talking aloud.  So much of

19  communication has to do with order and the processing of order

20  with the thought.

21       "This realization of processing thought makes me

22  reevaluate why I am the way I am.  I have always been

23  considered a shy, introverted person.  I believe, to an

24  extent, this has to do with this difficulty and frustration I

25  have explaining myself.

1       "Ever since I was three years old, I was described as

2  liking things to be orderly and very precise and as quite

3  annoyed when being touched by strangers, by my parents and

4  teachers.  When I was eight years old, I was described by my

5  parents and teachers as well as by the observation of my

6  examiner that I tend to be a perfectionist and have difficulty

7  handling situations where I cannot be in control and correct

8  all the time.

9       "I think this connection with being a perfectionist

10  also shows why I become frustrated.  Not only do I try to

11  cover up my flaws.  I have a difficult time explaining myself

12  to make my opinions understood and correct in others minds.

13  This is the reason for why I enjoy writing.  It takes time but

14  I am able to verbalize my opinions.

15       "When writing, I have the time I need to conceptualize

16  and solidify my thoughts.  I recently told a writing professor

17  I had that I liked the idea that once it exists in writing

18  rather than thought, it never goes away.

19       "I had so many thoughts racing through and cluttering

20  my mind, I needed to organize them and find a way to get them

21  out of my head.  This is one of the things writing has done

22  for me.

23       "Writing is an easier way for me to express myself

24  than trying to be understood by speech.  I sometimes feel like

25  I am speaking a different language or my own language when I

1   am unable to express myself.

2        "In the essay written by Amy Tan, 'Mother Tongue,' she

3   writes of her native Chinese mother:  'You should know that my

4   mother's expressive command of English belies how much she

5   actually understands.  She reads the Forbes report, listens to

6   *Wall Street Week*, converses daily with her stockbroker, reads

7   all of Shirley MacLaine's books with ease -- all kinds of

8   things I can't begin to understand.  Yet, some of my friends

9   tell me they understand 50 percent of what my mother says.

10  Some say they understand 80 to 90 percent.  Some say they

11  understand none of it, as if she were speaking pure Chinese.

12  But to me, my mother's English is perfectly clear, perfectly

13  natural.  It's my mother's tongue.  Her language as I hear it

14  is vivid, direct, full of observation and imagery.'"

15       "I can strongly relate to this paragraph.  I am able

16  to understand more than I am able to communicate in a given

17  time period.  People understand sometimes only little of what

18  I am trying to say because I have a difficulty explaining my

19  thoughts.  Sometimes I leave integral parts out of my

20  explanation leaving others confused.  My family understands

21  more the way I think, so I am more easily able to converse

22  with them.

23       "In a way, like Tan's mother, the Chinese culture, her

24  daughter and family understand her.  My immediate family,

25  close friends and I are my language culture.

1          "Even though I have this difficulty, I still do not

2    want exceptions made for me.  Exceptions and excuses

3    ultimately hold a person back but with understanding

4    hindrances, I hopefully can anticipate the problem and deal

5    with it.  I can consciously confront this difficulty I have.

6    I can better deal with the problem.  Therefore, it can be

7    minimized."

8    Q    Looking at the top of the page, Mr. Healy, what's the date

9    of that assignment?

10   A    February 28th, 2002.

11   Q    Now, sometime after you wrote that essay, your position on

12   exceptions changed, didn't it?

13   A    Yes, it did.

14   Q    How did that come about?

15   A    When I changed my major to being pre-med, I realized from

16   a chemistry course when trying to take the first exam that I

17   was not able to finish the test; and I knew that I was more

18   than capable of doing so.

19   Q    Did you make a formal request for accommodations while at

20   NYU?

21   A    Yes.  After that exam, I did.

22   Q    How did you go about doing that?

23   A    I went to the Center For Students With Disabilities, and

24   they referred me to a neuropsychologist by the name of

25   Dr. Amanda Baten.

1  Q    Did you see Dr. Baten for an evaluation?

2  A    Yes, I did.

3  Q    When was that?

4  A    November of 2002.

5  Q    How many times did you meet with Dr. Baten?

6  A    I met with her -- I'm sorry.  Can you repeat that?

7  Q    Sure.  How many times did you meet with Dr. Baten for that

8  first evaluation?

9  A    I met with her a number of times; two or three times.

10 Q    What do you recall from that evaluation?

11 A    I recall that there was an interview-type session; and she

12 reviewed some papers of mine, and she performed a number of

13 tests.

14 Q    Based on her evaluation, did she find that you had a

15 learning disability?

16 A    Yes, she did.

17 Q    Do you recall what her diagnosis was?

18        MR. KELSO:  Objection, Your Honor.  I think this is

19 hearsay at this point for him to say what her diagnosis was.

20        THE COURT:  Mr. Dutkanych?

21        MR. DUTKANYCH:  It's his diagnosis.  It's what he

22 learned from speaking with his doctor.  I can rephrase the

23 question.

24        THE COURT:  You may.

25

1  BY MR. DUTKANYCH:

2  Q    Mr. Healy, were you diagnosed with a condition?

3  A    Yes, I was.

4  Q    What condition were you diagnosed with?

5          MR. KELSO:  Same objection, Your Honor.  The actual

6  diagnosis is for the doctor to say.

7          THE COURT:  I think he can talk of his own

8  diagnosis.  Overruled.

9          You may answer if you know.

10  A    I was diagnosed with a reading disorder and with an

11  anxiety disorder.

12  BY MR. DUTKANYCH:

13  Q    Based on Dr. Baten's evaluation, did New York University

14  provide you with an accommodation?

15  A    Yes, they did.

16  Q    What was the accommodation they provided you?

17  A    Double time accommodations in a private and quiet setting.

18  Q    Did that accommodation apply to all of your classes?

19  A    Yes, it did.

20  Q    With these accommodations, were you able to complete your

21  studies at NYU?

22  A    Yes.

23  Q    When did you graduate?

24  A    In May of 2005.

25  Q    Do you recall what your grade point average was?

1 A   It was 3.5.

2 Q   And that was accomplished with accommodations provided by

3 the Moses Center at NYU?

4 A   Yes, it was.

5 Q   What was your major at the time you graduated?

6 A   It was an individualized major.  I went to the School of

7 Individualized Study at New York University.  So I set up my

8 own -- I set up my own major, but it was the intention to go

9 to medical school.  So I was pre-med.

10 Q   In order to go to medical school, did you have to take an

11 exam?

12 A   Yes, I did, the MCAT.

13 Q   Did you request an accommodation for the MCAT?

14 A   Yes, I did.

15 Q   What was the accommodation that you requested?

16 A   Double time in a private and quiet setting.

17 Q   Was there a procedure that you had to follow to obtain

18 that accommodation?

19 A   Yes.  I had to send my neuropsych evaluation to the AMC

20 and fill out the paperwork that they needed for asking for

21 accommodations.

22 Q   Were you approved for the accommodation?

23 A   Yes, I was.

24 Q   How did you do on the exam?

25 A   I did all right.

1  Q   Did you ultimately retake the exam?

2  A   Yes, I did.

3  Q   Did you have an accommodation the second time?

4  A   Yes, I did.

5  Q   Did you have to be reevaluated before you were granted the

6  second accommodation?

7  A   Yes.  I was evaluated again by Amanda Baten in late 2006.

8  Q   What did Dr. Baten do to reevaluate you?

9  A   There was the same type of interview process, and she was

10 familiar with me.  She also performed a number of tests and, I

11 believe, even more tests than she had prior.

12 Q   Did your diagnosis change after that?

13 A   I was still diagnosed with the reading disorder and with

14 anxiety.

15 Q   After your initial evaluation with Dr. Baten in 2002, did

16 you continue to see her for treatment?

17 A   After my initial evaluation with her, yes, I was.

18 Q   What were you being treated for?

19 A   Anxiety.

20 Q   Did you continue to receive treatment from Dr. Baten in

21 2006?

22 A   Yes, by Dr. Brewer.

23 Q   How many times did you see Dr. Brewer?

24 A   I'm still continuing to see Dr. Brewer at this time.

25 Q   Has Dr. Brewer diagnosed you with any particular

1  condition?

2  A    He's diagnosed me with an anxiety disorder and also with

3  ADHD.

4  Q    Based on Dr. Baten's second accommodation, did you receive

5  accommodations to take the MCAT for the second time?

6  A    Yes.  I got accommodations.

7  Q    How did you do on the second exam?

8  A    Well enough to get into medical school.

9  Q    Where did you enroll for medical school?

10  A    The Touro College of Osteopathic Medicine in New York.

11  Q    Did you apply for accommodations at TouroCOM?

12  A    I did.  I applied for double time in a private and quiet

13  setting.

14  Q    Did TouroCOM have a procedure that you needed to follow to

15  get those accommodations?

16  A    Yes.  I gave them a report from -- I gave the reports from

17  Amanda Baten and documentation that I've received

18  accommodations.

19  Q    Did you experience any other difficulties while at

20  TouroCOM?

21  A    Yes, I did.  The second year that I was in school, they

22  implemented a mandatory attendance policy; and I have trouble

23  taking notes during actual extra time.  They have a streaming

24  system where the lectures are online, and I was able to work

25  it out that I was excused from the mandatory attendance policy

MATTHEW HEALY – DIRECT/DUTKANYCH          34

1  and watched the streaming online so that I was able to play

2  back when necessary and take notes.

3  Q   Did you run into some difficulty during your first year of

4  medical school as well?

5  A   Could you say that again?

6  Q   Did you run into some difficulty during your first year of

7  medical school as well?

8  A   Yes, I did.  I had an alcohol problem.

9  Q   Did you undergo treatment for that dependency?

10 A   Yes, I did.

11 Q   Where did you receive treatment?

12 A   Accelerated Recovery Centers.

13 Q   Did you disclose to the treatment center your reading

14 disorder and anxiety issues?

15 A   I did.

16 Q   If you could look at Exhibit 101-16, page 470.

17      In the bottom box, can you read what it says next to

18 "Developmental delays"?

19 A   "Learning disorder reported per client.  Not defined or

20 treated."

21 Q   And you also identified your anxiety to your treatment

22 counselor?

23 A   Yes, I did.

24 Q   A little further down the page, it says, "Disabilities,

25 denies."  At that time, did you deny that you had any

1  disability?

2  A   I believe that I thought the question was maybe physical

3  disabilities.  I'm not sure.

4  Q   And you did disclose your learning disorder to them?

5  A   Yes, I did.

6  Q   Did you complete the treatment program?

7  A   Yes.  I completed the program.

8  Q   Did you return to school after that?

9  A   I did.

10  Q   Did you repeat your first year or how did that work?

11  A   I had to repeat my first year when I returned.

12  Q   What is your current status at TouroCOM?

13  A   I have a leave of absence right now because I still have

14  to complete the COMLEX Level 1 exam before I return for my

15  fourth year.

16  Q   You have completed your first three years though?

17  A   Yes, I have.

18  Q   When are you scheduled to take the next COMLEX Level 1

19  exam?

20  A   May 23rd.

21  Q   And what are the accommodations that you are seeking

22  again?

23  A   Double time in a quiet and private setting.

24  Q   What do you believe these accommodations will accomplish?

25  A   I believe that it will be a more accurate representation

 1  of what I'm truly capable of.

 2          MR. DUTKANYCH:  Thank you, Mr. Healy.  Those are all

 3  the questions I have.

 4          THE COURT:  Thank you.

 5          Your witness, Ms. Carroll -- Mr. Kelso.

 6          MR. KELSO:  Yes, Your Honor.

 7          THE COURT:  You may inquire.

 8                        **CROSS EXAMINATION**

 9  BY MR. KELSO:

10  Q    Mr. Healy, you believe you have trouble due to your ADHD

11  completing one task before moving on to another?

12  A    I do.

13  Q    Do you believe that you're easily distracted?

14  A    Yes.

15  Q    Do you think it takes you a longer time to read than the

16  average person?

17  A    I -- yes.

18  Q    How do you read, sir?

19  A    I read slowly at my own pace.

20  Q    Do you look at each word individually and read it or do

21  you look at groups of words together?

22  A    I look at the individual word and move on from there.

23  Q    Can you read faster than you speak, sir?

24  A    I'm sorry.  I don't understand.

25  Q    If you're not reading out loud, do you read faster than

1   when you read out loud?

2   A    No.  I read about the same.

3   Q    Do you pronounce the words to yourself inside your head as

4   you read or do you take them into your consciousness without

5   doing that?

6   A    I read each word -- I'm sorry.

7   Q    Do you pronounce the words to yourself inside your head as

8   you read or do you not do that when you read?

9   A    I don't believe that I pronounce them.  I think of each

10  word individually.

11  Q    Do you read for enjoyment, sir?

12  A    I spend quite a bit of time studying.  I read some news

13  and for enjoyment.

14  Q    Have you ever read novels or magazines for enjoyment?

15  A    Not very often.

16  Q    Do you recall doing that as a child, particularly, books

17  that you liked?

18  A    No, not very often.

19  Q    Do you read those type of things when you do differently,

20  for example, than reading a calculus problem?

21  A    I'm sorry.  Can you repeat the question?

22  Q    If you're reading for enjoyment a news article, do you do

23  that differently than if you're trying to understand a written

24  calculus problem that you have to solve?

25  A    No.  I believe I read them pretty much the same, unless

1  it's a timed-type situation and I become much more anxious.

2  Q   Have you ever taken any classes specifically designed to

3  increase your reading speed?

4  A   No, I have not.

5  Q   When you were at Northward Middle School, you recall

6  thinking that it just took you a longer time to read?

7  A   I remember that it took me a substantially longer time to

8  read.  I would see that all of my classmates were several

9  pages ahead of where I was.  In novels, I was always finishing

10  tests and assignments that needed to be turned in at the end

11  of class.  Sometimes I didn't need more time, so those types

12  of things.

13  Q   You received As and Bs, though, all through middle school;

14  is that correct, sir?

15  A   That's correct.

16  Q   There were other students in your classes receiving Cs and

17  worse?

18  A   I would imagine.

19  Q   In Colorado when you were finishing high school and

20  training for competitive skating, at that time you didn't feel

21  any anxiety or symptoms of ADHD; is that correct?

22  A   No.  I do recall anxiety when I was in school-type

23  situations and also socially when I would have to tell a story

24  or explain my thoughts and -- yeah, that's -- yeah.

25  Q   Do you recall testifying in your deposition that with

1  regard to the time you were in Colorado, that you didn't have

2  any evaluation or treatment for disabilities and that you

3  didn't have any anxiety or symptoms of ADHD?  Do you recall

4  testifying to that effect in your deposition?

5  A   I'm sorry.  Can you say that again?

6  Q   Yes, sir.  When you gave your deposition to Ms. Carroll on

7  February 7, 2002, do you recall testifying at that time that

8  you didn't have a primary care physician in Colorado, that you

9  didn't have any evaluation or treatment for disabilities and

10 that you didn't have anxiety or symptoms of ADHD?

11 A   In Colorado, I didn't take classes at school.

12 Q   But you at that time also did not have any anxiety or

13 symptoms of ADHD; is that correct?

14 A   That's correct.

15 Q   Then you were not accommodated for the SAT exam, and you

16 were also not accommodated for the ACT exam; is that correct?

17 A   That's true.

18 Q   Between your high school graduation and starting at NYU,

19 you had no significant medical issues, social or emotional

20 difficulties; is that correct?

21 A   That's true.

22 Q   And during that time also between your high school

23 graduation and starting at NYU, you had no treatment for

24 disability or impairment?

25 A   No, I didn't.

1  Q   When you started at NYU, you were not accommodated that

2  first year; is that correct?

3  A   That's correct.

4  Q   So you took regular classes, regular tests, same time as

5  everybody else?

6  A   The majority of my classes my first year, they either

7  didn't consist of exams.  They were written essays.  There

8  were some in-class exams.  I recall an informal accommodation

9  with one teacher as far as getting -- or being able to type an

10 essay exam when everybody else wrote it.

11        The second time, she had me write it; and it took me

12 significantly longer.  I went over class time.

13 Q   That was your sociology teacher that allowed you that

14 extra time?

15 A   Yes.

16 Q   And you showed her one of those reports that you had from

17 your childhood; is that correct?

18 A   Yes.

19 Q   And she gave you some extra time in that one class?

20 A   Yes, she did.

21 Q   But for the rest of your classes that one year, you got

22 nine As and one B, and the only accommodation you got was from

23 that one sociology teacher; is that correct?

24 A   Yes.  But I either didn't have exams in those classes

25 or --

*MATTHEW HEALY – CROSS/KELSO*                 41

1   Q   And then you got a scholarship as a result of those

2   grades; is that correct?

3   A   I don't recall if it was because of my grades, but I did

4   receive a scholarship -- a small scholarship.

5   Q   And it was based on your performance your first year at

6   NYU?

7   A   I'm not sure why I received the scholarship.  Sorry.

8   Q   Your second year, you changed your major to pre-med; and

9   that's when you started having problems, right?

10  A   That's correct.

11  Q   And your chem 1 class, specifically, you withdrew from

12  that?

13  A   Yes.  I had to withdraw.

14  Q   Other than the chem 1 class, you had other grades the

15  second year, B plus in general chemistry, A minus general

16  chemistry lab, and an A in precalculus mathematics the second

17  year; is that correct?

18  A   Yes.  That's correct, but I was receiving accommodations I

19  believe then.

20  Q   And you graduated May of 2005 from NYU in four years?

21  A   Yes, I did.

22  Q   Your difficulty getting you into medical school was one

23  thing that prompted you to see Dr. Brewer; is that correct?

24  A   Yes, and anxiety issues.

25  Q   Your first year of medical school you were being

1   accommodated with double time and a quiet room?

2   A   I'm sorry.  Say that again.

3   Q   Your first year of medical school exams, were you being

4   accommodated with double time and a quiet room?

5   A   Yes, I was.

6   Q   This is when you had the alcohol problem.  You dropped out

7   of school, went through a two-week intensive program of

8   rehabilitation in Atlanta, correct?

9   A   That's correct.

10  Q   You were also seeing Dr. Brewer during that time?

11  A   Yes, I was; and there was several follow-up weeks with the

12  program as well.  It wasn't just the two-week intensive

13  program.

14  Q   So that was additional follow-up after the two weeks was

15  over?

16  A   That's correct.

17  Q   And back at school the next year, you continued to receive

18  As, Bs and some Cs in years one and two as you progressed then

19  through medical school?

20  A   Yes, because I was receiving accommodations.

21  Q   And then year three is when you started streaming the

22  lectures rather than attending class?

23  A   My third year I was on clinical rotations.

24  Q   April 2011 you registered for the COMLEX Level 1 exam

25  without accommodations?

1   A   I did so because I had to take the exam, and the only way

2   to sign up for the exam is to either say you're not getting

3   accommodations or you can't sign up.  You have to go through a

4   process where you're sending in through the mail, and they

5   denied me both times.  But I –– but I did sign up without

6   accommodations because that was the only way that I was

7   allowed to.

8   Q   And when you took that test without accommodations, you

9   stated, quote, "Even just skimming and trying to come up with

10  an answer, I just would finish just on time."  What do you

11  mean by that, sir?

12  A   I would read quickly through a question and make an

13  answer, go on to the next, try to read through it quickly,

14  make an answer.  I really wasn't able to try and comprehend,

15  try to think before answering.  And sometimes I would just

16  make an answer even if I didn't understand the question.  I

17  had no time to reread questions.  I had no additional time to

18  do anything.  I just knew that I had to go straight through

19  it.

20  Q   Your use of the word "skimming" there, sir, in your

21  deposition answer, what did you mean by that?

22  A   Reading as quickly as I could.

23  Q   But even your use of the word "skimming," you're still

24  looking at every single word in a question and reading each

25  word individually?

1  A    Yes, but perhaps I try to do that more quickly.

2  Q    Have you ever been hospitalized for anxiety, sir?

3  A    No, I have not.

4  Q    I would like you, please, to refer to Exhibit 101-15,

5  beginning at page 457.  Do you see that page, sir?  It's

6  written on New York University stationery and it has 00457 in

7  the lower right-hand corner?

8  A    I do.

9  Q    And that's a letter of recommendation written on your

10 behalf?

11 A    Yes.

12 Q    And you submitted these to -- when you were trying to get

13 into Touro Medical School?

14 A    Yes.

15 Q    I would like you to refer to the bottom of page 457, that

16 last paragraph, where one of your professors state that they

17 were very impressed with your laboratory and intellectual

18 skills, described you as very intelligent without being

19 arrogant and always a pleasure to chat with.  "He can explain

20 things clearly and is well organized."  Would you agree with

21 that professor's summary of your work?

22 A    I would rewrite my notes for that class, and I was very

23 neat and organized for organic chemistry.  I enjoyed that

24 class.  So I had everything written out so when I would

25 explain something to him or something, I could kind of step

1  him through how I was thinking.  So that's, I believe, where

2  that statement comes from.

3  Q   Going over then to the top of page 458, the first sentence

4  that starts in the first line there, "In the very different

5  field of writing, Professor Smith calls Matthew, quote, 'a

6  concise and precise writer and a person who goes into exact

7  detail in his work.  His contributions to the class were

8  invaluable.  His insight and demeanor were always of the

9  highest level.  He was a huge asset to the class and developed

10  quickly from exploring his own writing process," unquote.

11        Would you agree with that summary of your work in that

12  class, sir?

13  A   I agree because I had the time and spent quite a bit of

14  time writing -- spending time writing so that I could be clear

15  and concise because I often had to rework my ordering and have

16  things make sense and make sure that my point was clearly put

17  out and things would logically flow.  So it was a conscious

18  effort of trying to work through that.

19  Q   And, sir, referring over to page 00459, again, another

20  letter written on New York University stationery.  Who was

21  Ronald Callahan that signed this letter?

22  A   He was my organic chemistry teacher of my second semester.

23  Q   Referring in the first paragraph there, almost halfway

24  down, there's a sentence that begins over toward the right

25  that states, quote, "He had the ability to assimilate

1   technical material easily and was able to carry out any

2   last-minute modifications in the experiment with ease,"

3   unquote.

4        Would you consider that an accurate description of

5   your performance in that class?

6   A   I believe that had to do with the unknown substance, when

7   we had to figure out an unknown substance.  I had narrowed it

8   down to just a few.  I was able to at the kind of last minute

9   run another quick test, and I had to run that test several

10  times and got it down to two; but then I picked the wrong one.

11  But he saw me as hard-working and --

12  Q   Professor Callahan goes on, sir.  After that sentence, he

13  states, quote, "He was efficient and patient and waited calmly

14  if needed laboratory materials were delayed," unquote.  Do you

15  agree with that assessment, sir?

16  A   Where are you?

17  Q   It's the sentence immediately after the one we just

18  reviewed.

19  A   Can you please just repeat the statement?

20  Q   I'm sorry, sir?

21  A   Can you please just repeat the statement?  I wasn't with

22  you the first time either.

23  Q   It's approximately one halfway down through the first

24  paragraph; and it begins with the words, "He was efficient."

25  A   Okay.

1   Q    Do you see that, sir?

2   A    Yes.

3   Q    "He was efficient and patient and waited calmly if needed

4   laboratory materials were delayed."

5        Do you agree with that assessment of your performance

6   in that class?

7   A    Yes.  I didn't mind staying later if I had to.  I normally

8   had to stay late anyway.

9   Q    And there at the very bottom of that paragraph, it also

10  states, quote, "His speaking skills are excellent," unquote.

11  Do you see that, sir?

12  A    Yes, I do.

13  Q    Would you agree with that professor's assessment of that

14  characteristic?

15  A    I don't know how he made that assessment.  I don't agree

16  with that.

17  Q    Halfway through the bottom paragraph there, there's a

18  sentence that states, quote, "He can explain things clearly,

19  and is well organized," unquote.

20        Do you agree with that professor's assessment of your

21  performance in that class and his observations of you?

22  A    Again, like I said before, this is probably referring to

23  how I would rewrite my notes and -- organic chemistry is very

24  visual.  So I could lead him through a diagram and explain how

25  I thought through a process, and that was good for me.

1  Q   The next letter there, sir, that begins at page 460.

2  David Quartermain has signed this letter.  Who was he, sir?

3  A   He was my -- he was an advisor.

4  Q   And he knew you for two years at the time he wrote this

5  letter, and he was a pre-med advisor and a research supervisor

6  for you?

7  A   Yes, he was.

8  Q   That letter states at the beginning of the bottom

9  paragraph, "Matthew is a highly motivated and very bright.  He

10  quickly learns new techniques and research skills."

11       Do you agree with that assessment of Professor

12  Quartermain's observations?

13  A   He -- he was not the doctor that I worked with.  He was

14  only an advisor and -- but I think that he knew that I was

15  committed and worked hard.

16  Q   The next page there, sir, 00461, who are those people that

17  signed this letter, Robert Crowley and Linda Crowley?

18  A   They were past people that I had worked with in skating,

19  coaching and otherwise.

20  Q   There at the bottom of the third paragraph there, the last

21  three sentences, they're talking about figure skaters and

22  qualities they must have.  It states, "They must learn to be

23  strong time managers.  Most skaters are strong students since

24  their time is at a premium.  When skaters achieve the highest

25  test level and also show significant involvement and

1   achievement in school, that is a very special person."

2          And then the next paragraph goes on, "Matt fits this

3   description and not just by his test accomplishments."

4          Would you agree with that, sir, that being in figure

5   skating helped you be a good time manager?

6   A   I have difficulty organizing my time.  I -- so I guess I

7   don't entirely agree with that statement.

8   Q   On the next page, sir, 00462, these are some comments by

9   some of your other professors; is that correct?

10  A   Yes.

11  Q   The precalculus professor stated you finished with the

12  fourth highest average out of 120 students.  Your final exam

13  score was the highest in the class.  Then on one difficult

14  problem on the final exam, you were the only student to solve

15  the problem correctly.  Is that a fair statement there?

16  A   I was receiving accommodations at the time, and I spent a

17  lot of time and worked very hard to do that well.

18  Q   The writing workshop there, Professor Steven Smith, it

19  states, "In my class, he excelled at every assignment that he

20  undertook.  He's a concise and precise writer and a person who

21  goes into exact detail in his work."

22          Do you agree with his assessment there?

23  A   Again, that's because when I have the time to work through

24  my thoughts, I am capable of being concise and precise.

25  Q   The next page, 00463, this was your calculus professor?

1   A   Yes.

2   Q   He states that you've -- that he knew you for three years

3   and took a calculus one course from you (sic), that you were

4   among the best students in his class.  Is that a fair

5   statement, sir?

6   A   Yes.  I went to many tutoring sessions that he had and his

7   TA had, and I worked with him closely and worked very hard.

8   Q   It says here in the middle of that second paragraph in

9   Professor Masmoudi's letter, he states, "I think he got the

10  best score in the final exam and earned an A for the

11  semester."

12       Do you see that, sir?

13  A   Yes, I do.

14  Q   And you're saying you took that exam in a separate room

15  with double time?

16  A   I took it in a private room and had some other test takers

17  that took tests at the CST, Center For Students With

18  Disabilities, and yes, with double time.

19  Q   Was the final exam in that calculus class -- how many

20  pages long was that?

21  A   I don't recall.  It was maybe 7 or 8 pages.

22  Q   Word problems or were they set out in numbers alone?

23  A   I believe there was both.

24  Q   The next page there, 00464, this was in the materials that

25  was sent to us; but it's unclear who signed this letter.  It's

1   got Spence Taylor, M.D., Chair at the top.  The next page is

2   on the same sort of stationery and signed by Bruce Gray.  Do

3   you know who wrote this letter, the one that begins at 00464?

4   A   I don't know for sure.  I would have to guess Spence

5   Taylor since his name's at the top.

6   Q   And you did work with Spence Taylor?

7   A   Not directly.

8   Q   There's a note there at the bottom of the third paragraph

9   where it says, "Matt worked incredibly hard, including several

10  late nights with me to get this project completed under a

11  rigorously-imposed deadline."

12       Do you recall working with the professor as to that

13  project, sir?

14  A   This may have been written by Spence Taylor's -- his

15  associate, the person that he worked closely with because I

16  did work closely with him.

17  Q   What was his name, sir?

18  A   Corey Kelbaugh.

19  Q   Kelbaugh?

20  A   Kelbaugh.

21  Q   So this letter was either written by Mr. Taylor himself or

22  Dr. Taylor or Professor Kelbaugh?

23  A   That's correct.

24  Q   I note there in the bottom paragraph, it says, "He has a

25  genuine interest and passion for medicine and it seemed to me

1  that these sparked an unusual ability to quickly understand

2  the material that I was teaching him."

3        Is that a fair statement, sir?

4  A   I'm sorry.  Where is that?

5  Q   It's about four lines up from the bottom.

6  A   Okay.

7  Q   Four or five -- it's actually the fifth and third line

8  from the bottom of that paragraph on page 00464.

9  A   When we would work on something, I would look it up and

10 try to show that I knew something about it and that I cared

11 about his subject and that I was learning from him.  So yes.

12 Q   And you submitted these recommendations on your behalf on

13 your application for Touro; is that correct?

14 A   I don't recall if some were sent in separately or if I

15 sent them all in myself, but it was for my medical school

16 application.

17        MR. KELSO:  That's all I have, sir.  Thank you.

18        THE COURT:  Thank you, Mr. Kelso.

19        Redirect?

20        MR. DUTKANYCH:  Yes, Your Honor.

21                    **REDIRECT EXAMINATION**

22 BY MR. DUTKANYCH:

23 Q   Mr. Healy, we just spent some time going through your

24 recommendations that were submitted to medical school.  Any of

25 those individuals, did you ever ask them to evaluate you for a

*MATTHEW HEALY – REDIRECT/DUTKANYCH*                    53

1   reading disorder?

2   A   No, I did not.

3   Q   Did any of those individuals evaluate you for an anxiety

4   disorder?

5   A   No, they did not.

6   Q   What about ADHD?

7   A   No.  They wouldn't -- they're not trained to pick up on

8   that.

9   Q   How would you have felt if each of those individuals noted

10  that I think Mr. Healy has a learning disability or is very

11  anxious or suffers from ADHD?  Would you still have submitted

12  that as a letter of recommendation to medical school?

13  A   No, I wouldn't have.

14  Q   Would you have felt that would be inappropriate?

15  A   Yes.

16  Q   And were any of those people in a position to opine about

17  whether or not you suffer from a disorder or condition?

18  A   I'm sorry.  Say that again?

19  Q   Were any of those individuals in a position to opine about

20  whether you have a disorder or a medical condition?

21  A   No.  They wouldn't be.

22  Q   Do you feel like that would be a proper subject for a

23  letter of recommendation?

24  A   No, it would not.

25  Q   During your time at New York University, you were

1  receiving accommodations, correct?

2  A   Yes, I was.

3          MR. DUTKANYCH:  Those are all the questions I have.

4          THE COURT:  On those issues, Mr. Kelso?

5          MR. KELSO:  Nothing further, Your Honor.

6          THE COURT:  You may step down.  Thank you.

7      *(Witness excused.)*

8          THE COURT:  Mr. Dutkanych, do you have any

9  additional live witnesses.

10          MR. DUTKANYCH:  I do have one additional witness,

11  Nancy Healy, Mr. Healy's mother.

12          THE COURT:  All right.  Let's take a brief recess

13  before we start with the additional witness.  Let's take 10

14  minutes.

15          COURT CLERK:  Please rise.

16          Court will be in recess.

17      (A recess was taken.)

18          THE COURT:  Be seated.  Mr. Dutkanych, you may call

19  your next witness.

20          MR. DUTKANYCH:  I would like to call Nancy Healy.

21          THE COURT:  You may.

22      *(Witness sworn.)*

23          THE COURT:  Be seated, please.

24          Mr. Dutkanych, you may inquire.

25

1          **NANCY HEALY, PLAINTIFF'S WITNESS, SWORN**

2               **<u>DIRECT EXAMINATION</u>**

3    BY MR. DUTKANYCH:

4    Q    Could you state and spell your name for the record,

5    please?

6    A    Nancy Healy, N-A-N-C-Y H-E-A-L-Y.

7    Q    How do you know Mr. Healy?

8    A    He's my son.

9    Q    Has Mr. Healy had any significant illnesses growing up?

10   A    Yes.

11   Q    Could you describe those for me?

12   A    Yes.  He had from approximately age two to four three

13   unexplained altered states of consciousness.

14   Q    Was Mr. Healy hospitalized as a result of those?

15   A    Yes.  The first two, he was hospitalized at around age

16   two, when we were living in Florida, for three days.  They did

17   a number of tests on him; and all the tests came back normal,

18   inconclusive.  After three days, he got better; and he was

19   discharged from the hospital.

20          The second time he was hospitalized was after we moved

21   to Maryland, and he was hospitalized for about one day.  They

22   did a lumbar puncture at that time; and again, it just

23   resolved, and they did not ever find out the cause of the

24   altered state of consciousness.

25   Q    Other than those periods of unresponsiveness, did

NANCY HEALY - DIRECT/DUTKANYCH                    56

1  Mr. Healy experience any other difficulties growing up?

2  A    I'm sorry.  Could you rephrase the question?

3  Q    Sure.  Other than those three periods of unresponsiveness,

4  did Mr. Healy experience any other difficulties while he was

5  growing up?

6  A    Yes.  He was a very rigid child.  He was very -- he liked

7  to have a routine.  He had difficulty speaking.  His speech

8  came late in his life and when he -- prior to actually

9  speaking, you knew that he understood what you said.  He would

10  easily follow directions, but he had to use a lot of pantomime

11  to get his meaning across to you before his words were

12  understood.

13  Q    Did you consult with anyone regarding his difficulty

14  speaking?

15  A    Yes, I did.  I spoke with his pediatricians, and I finally

16  convinced one that he needed to go to -- I would like to have

17  him evaluated by a speech therapist.

18         She initially had his hearing tested first; and then

19  once it was determined that his hearing was normal, he went

20  and was evaluated by a speech therapist in Maryland.

21  Q    Mrs. Healy, can you look at Exhibit 101-01?  Do you

22  recognize that document?

23  A    Yes, I do.

24  Q    What is that document?

25  A    It's his evaluation from the Speech Language Center of

1  Olney.

2  Q   What did you learn from that evaluation?

3  A   Well, I learned that Matt needed to have speech therapy.

4  Q   Was that recommended for him?

5  A   Yes.

6  Q   For how long did he undergo speech therapy?

7  A   Approximately nine months to a year.

8  Q   Who was the next professional you took Mr. Healy to see

9  regarding his difficulties?

10  A   When he was in school, he went to see Madge Connor in

11  Greenville.

12  Q   What school was he attending at that time?

13  A   He was attending the Montessori School in Greenville.

14  Q   Approximately how old was he when he saw Madge Connor?

15  A   Eight.

16  Q   What did you learn from the evaluation by Madge Connor?

17  A   I learned that there was a wide discrepancy in Matt's two

18  IQ scores, actually, two standard deviations.  This caused him

19  to have difficulty getting the words out that he wanted to

20  say.  He had trouble processing information.

21  Q   Now, you mentioned that Mr. Healy attended the Montessori

22  School.  Why did you send him to that school?

23  A   I sent Matt to a Montessori program because I knew that

24  they worked with individuals, and they let people work at

25  their own pace; but it was still a structured environment.  I

1   knew that with Matt being such a rigid and perfectionistic

2   child, that he needed some structure; but he also needed to be

3   allowed to do things at his own pace in order to get the

4   material.

5   Q    After Mr. Healy was seen by Madge Connor, did he continue

6   to experience difficulties learning?

7   A    Yes.

8   Q    How did those manifest themselves?

9   A    He was easily frustrated by his school work.  It took him

10  longer to do his homework.  He was much slower at reading,

11  expressing his thoughts, getting things out on paper.

12  Q    Mrs. Healy, where did Mr. Healy go to high school?

13  A    He went to Lawrence North.

14  Q    Here in Indianapolis, correct?

15  A    That is correct.

16  Q    Did you accompany him to Indianapolis?

17  A    I did.

18  Q    Did his father accompany him as well?

19  A    No.

20  Q    What about his sister?

21  A    No.

22  Q    So during the period where he was competing for figure

23  skating, was it you who primarily accompanied him living wise?

24  A    Yes.

25  Q    And during that time, you were living apart from your

1  husband to allow Matt to train for his figure skating?

2  A   Yes.

3  Q   While Matt was in high school, did he receive extra time

4  or leniency from his teachers to complete assignments?

5  A   Yes.

6  Q   Did you notice from all the teachers or was there anybody

7  who gave some pushback to that?

8  A   He received time from all of his teachers.

9  Q   Did that apply to each of the high schools that he

10 attended?

11 A   He received that at Cardinal Ritter during the 9th –– I'm

12 sorry –– during the 10th and 11th grade.  Then when we moved

13 to Colorado and he attended Cheyenne Mountain High School, he

14 also received that.

15 Q   Did he attend regular classes at Cheyenne High School?

16 A   No.  He enrolled in three classes when we first moved out

17 there; but after being there one week, it became evident that

18 he was not going to be able to keep up his skating schedule

19 and attend school.  So he was tutored by a woman named Rose

20 Hammond at the rink in senior English.

21 Q   When did Mr. Healy stop skating competitively?

22 A   Nationals, 2000 in Cleveland.

23 Q   And after that, he attended New York University?

24 A   That is correct.

25 Q   Did he report any difficulty with his school work to you?

1  A   He reported to me when he went to the Moses Cone Center.

2  Prior to that, he would always run his school work by me.  He

3  would e-mail it to me, let me look it over, make corrections

4  and send it back to him.

5  Q   Mrs. Healy, does your husband suffer from a learning

6  disability?

7  A   Yes.

8  Q   What does your husband do for a living?

9  A   He is a nephrologist.

10 Q   What is a nephrologist?

11 A   It's a physician that specializes in kidneys, dialysis,

12 hypertension.

13 Q   As his mother, do you believe Mr. Healy suffers from a

14 learning disability?

15 A   Yes.

16 Q   Why so?

17 A   Because ever since he was a small child, he's always had

18 difficulty expressing himself; and I think it's affected

19 everything throughout his whole life, not just his school

20 work; but when he speaks to other people, in his ability to

21 engage in a social interaction, he kind of hangs back because

22 he's afraid that he's going to be misunderstood.

23 Q   Besides being his mother and traveling all over the

24 country for his figure skating, in your professional career,

25 what did you do?

1  A   I was a psychiatric nurse.

2           MS. CARROLL:  Did you say in her professional

3  opinion?

4           MR. DUTKANYCH:  No, professional career is what I

5  said.

6  BY MR. DUTKANYCH:

7  Q   What did you do?

8  A   I was a registered nurse.

9  Q   As a nurse, did you have a specialty?

10 A   I worked child and adolescent psychiatric.

11          MR. DUTKANYCH:  Those are all the questions that I

12 have.

13          THE COURT:  Ms. Carroll, your witness.

14          You may inquire.

15                    **CROSS EXAMINATION**

16 BY MS. CARROLL:

17 Q   Ms. Healy, there was no recommendation for further

18 treatment when Matthew was discharged from speech therapy, was

19 there?

20 A   Are you referring to Maryland?

21 Q   No.  In 1985, yes, when he was discharged from speech

22 therapy, there was no further recommendation for treatment,

23 was there?

24 A   No.

25 Q   The next year, he went to see John Pence at Columbus,

1   Hospital, correct?

2   A   That is correct.

3   Q   At that time, Dr. Pence indicated that he was -- had

4   speech that was age appropriate, didn't he?

5   A   He did.

6   Q   You indicated that the Matthew went through -- had some

7   illnesses?

8   A   That's correct.

9   Q   Didn't you around this time that you saw Dr. Pence --

10  didn't you also have him tested by a neurologist, Dr. Detrick;

11  and he indicated there was nothing wrong neurologically with

12  Matthew?

13  A   Dr. Detrick reviewed Matt's records.

14  Q   And he indicated there was normal findings based upon his

15  opinion; isn't that correct?

16  A   He stated that he did not see anything in the records.

17  Q   At the next evaluation in 1989 with Madge Connor, she

18  determined there was no specific reading disability, right?

19  A   What I learned from her was that Matt had difficulty in

20  processing information, and he did have difficulty with being

21  able to process written information.

22  Q   But she did not make a specific reading disability

23  diagnosis, did she?

24  A   She did not.

25  Q   And in fact, isn't it true she found that his reading

1  skills were age and grade appropriate.

2  A    She -- what I learned was that his -- it wasn't matching

3  up with his intelligence.

4  Q    Can you refer to Exhibit 101-3, Bates No. 14 -- or I'm

5  sorry -- Bate No. 19, please?

6  A    Okay.

7  Q    She says, "No specific reading disability with Matt.

8  Reporting age and grade appropriate reading skills."  Isn't

9  that what that No. 2 indicates, Ms. Healy?

10 A    That's what that says.

11 Q    And she made no recommendation for further treatment, did

12 she?

13 A    She did not.

14 Q    Can you turn, please to Exhibit 104-4, and Bate No. 24.

15 So 101-4 and the next page, No. 25.

16       Did you ever receive copy of Matthew's results on the

17 achievement tests reflected on pages 25 through 31 indicating

18 that he tested above the national average and above his grade

19 level on all items?  Did you ever receive a copy of these?

20 A    I do not recall.

21 Q    And he attended the Montessori from grades two through

22 fifth?

23 A    No.

24 Q    What grades did he attend the Montessori?

25 A    He attended Montessori from pre-K4 through fifth grade.

1  Q    Okay.  Can you refer to that same exhibit, Bate No. 32?

2  Did you ever receive a copy of this document or were you ever

3  aware that the Montessori submitted his written recommendation

4  to be placed in a challenged curriculum in the middle school?

5  A    No.  I don't recall that.

6  Q    And can you refer to the next page, please, 33.  Were you

7  ever given a copy of this documentation or discussed this with

8  anyone regarding his observed characteristics during the

9  Montessori school?

10 A    I don't recall.

11 Q    You said beginning in 6th grade and continuing through his

12 middle school classes, Matthew would spend the mornings at the

13 ice rink and the evenings at the ice rink and in between at

14 school, wouldn't he?

15 A    That's correct.

16 Q    However, during this time, he was required to attend all

17 classes and exams at the school, correct?

18 A    Yes.

19 Q    Isn't it true that Matthew received no accommodations for

20 the timed standardized tests taken during middle school?

21 A    That's correct.

22 Q    Now, Matthew is neither young for his class or old for his

23 class.  He is right in the middle, right?

24 A    Yes.

25 Q    And he has never been held back; and he's never skipped a

1  grade, correct?

2  A    No.

3  Q    While Matthew was at NYU, he went to see Dr. Baten for the

4  purposes of obtaining test accommodations; is that correct?

5  A    That is correct.

6  Q    Isn't it true that you spoke with Dr. Baten on only two

7  occasions?

8  A    That is correct.

9  Q    Both occasions for the purpose of receiving payment for

10  those evaluations?

11  A    Yes.

12  Q    No questions on either of those occasions were asked

13  about -- were asked about or there was no discussion regarding

14  the results of her evaluation or her recommendations?

15  A    No.

16  Q    And you testified you have a degree as a registered nurse?

17  A    Yes.

18  Q    And your husband's a physician?

19  A    That is correct.

20  Q    And your experience involves working in a hospital as well

21  as a private practice with child psychiatrists?

22  A    That's correct.

23  Q    And, in fact, you worked with Dr. Brewer, who -- in the

24  both of those circumstances, didn't you?

25  A    Yes.

1  Q   It was your idea for Matthew to be seen by Dr. Brewer,

2  wasn't it?

3  A   It was.

4  Q   And you're also a patient of Dr. Brewer's, aren't you?

5  A   I am.

6  Q   So after the evaluation by Madge Connor in 1989, you did

7  not seek any further treatment or evaluation of Matthew, did

8  you?

9  A   No.

10 Q   So the next evaluation Matthew had was 13 years later when

11 he saw Dr. Baten for the purposes of obtaining accommodations

12 on his exams at NYU, right?

13 A   That is correct.

14         MS. CARROLL:  No further questions.

15         THE COURT:  Redirect?

16         MR. DUTKANYCH:  I have no additional questions, Your

17 Honor.

18         THE COURT:  You may step down.  Thank you.

19    *(Witness excused.)*

20         THE COURT:  Further live witnesses, Mr. Dutkanych?

21         MR. DUTKANYCH:  No, Your Honor.

22         THE COURT:  All right.  You have doctors'

23 depositions, do you not?

24         MR. DUTKANYCH:  Two of them, Dr. Amanda Baten and

25 Dr. Charles Brewer.

1          THE COURT:  Then it would be your intent after

2    review of those depositions that you will be prepared to rest;

3    is that correct?

4          MR. DUTKANYCH:  That's correct, Your Honor.

5          THE COURT:  And let me just have a rehash.  It's my

6    recollection that you wished to have the Court review your

7    depositions preliminary to the live witnesses that it is your

8    intent to call; is that correct?

9          MS. CARROLL:  I think that's fine, Your Honor, yes.

10          Yes, Your Honor that's correct.  We intend to have

11    our live witness tomorrow morning.

12          THE COURT:  All right.  Let's see.  Why don't you

13    introduce then, Mr. Dutkanych, your videotaped depositions via

14    disk for the Court's review in camera.  Then we will -- I want

15    to just make sure we kind of get this in sequence.

16          At that point, probably when we come back first

17    thing tomorrow morning, you will rest.

18          Case will then turn to the defendant.  If you have

19    motions, that's fine.  We'll do that at that time also.

20          The Court will have already reviewed your disks.

21    You'll call your witness -- your live witness.

22          MS. CARROLL:  Okay.

23          THE COURT:  Presumably, you will rest.  The

24    opportunity for rebuttal if you choose.  Then we will have --

25    let's do this.  I think what I want is some type of

1   abbreviated final argument.  In other words, I kind of want

2   you to hit the high points.

3           Then I am going to allow you to do some post-trial

4   submissions on a fairly quick timetable where you may

5   elaborate a little bit more than I'm going to give you time to

6   do in final arguments.  Then the case will be submitted to me

7   for determination.  Does that kind of work for you all?

8           MR. DUTKANYCH:  That works for the plaintiff, Your

9   Honor.

10          MS. CARROLL:  Your Honor, counsel and I did discuss

11  that.  We would be prepared to submit our briefs on Monday if

12  the Court would so desire, given the time frame we've got

13  here.

14          THE COURT:  All right.  We can talk about that

15  tomorrow, but that will be fine then.

16          All right.  With that then, you would be introducing

17  the testimony, if you will, Mr. Dutkanych of what two doctors?

18          MR. DUTKANYCH:  Dr. Amanda Baten and Dr. Charles

19  Brewer.

20          THE COURT:  All right.  The Court will accept the

21  disks as to each of those.  We will review those; and

22  Ms. Carroll, you will then be asking that the Court review

23  testimony of whom?

24          MS. CARROLL:  Dr. Joseph Bernier, B-E-R-N-I-E-R, and

25  Dr. Kevin Murphy.

1          THE COURT:  My recollection was that all of those

2    are about an hour?

3          MS. CARROLL:  Yes, sir.

4          MR. DUTKANYCH:  Yes, Your Honor.

5          THE COURT:  We should have plenty of time to get

6    that done today.  Anything else we can do today?

7          MR. DUTKANYCH:  Not for the plaintiff, Your Honor.

8          MS. CARROLL:  I did submit amended stipulation of

9    trial exhibits, Your Honor.  We had discussed this, I believe,

10   briefly at the final pretrial; and with the exception of

11   admissibility of 401-01 and 401-02, the parties would offer

12   those into evidence.

13         THE COURT:  Let me get that.

14         Right.  So is there a joint request then that the

15   Court consider as admitted exhibits all of those exhibits

16   noted in the amended stipulation but for 401-01 and 401-02?

17   Is that how you want to do that?

18         MR. DUTKANYCH:  I believe so, Your Honor.  We'll

19   withdraw 401 and 402.

20         THE COURT:  Very well.

21         The Court would then accept the exhibits listed on

22   the submission of amended stipulation of trial exhibits, will

23   now admit them into evidence but for 401-01 and 401-02, which

24   will be shown as withdrawn.

25         Very well.  Anything else?

1          MR. DUTKANYCH:  Nothing further from the plaintiff,

2    Your Honor.

3          THE COURT:  Very well.  Do I have the disks?

4          MS. CARROLL:  You have four original copies.

5          MR. DUTKANYCH:  They are in the binder.

6          THE COURT:  Why don't we start about 9:30 tomorrow

7    morning.  Very well.  See you all tomorrow.

8          COURT CLERK:  Please rise.

9          *(The proceedings were adjourned at 11:15 a.m.)*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF COURT REPORTER

2

3         I, Cathy Jones, hereby certify that the foregoing is a

4    true and correct transcript from reported proceedings in the

5    above-entitled matter.

6

7

8      /s/ Cathy Jones                    July 17, 2012
     _____
9      CATHY JONES, RPR, FCRR
       Official Court Reporter
10     Southern District of Indiana
       Indianapolis Division
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25