1          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF INDIANA
2               INDIANAPOLIS DIVISION

3
   MATTHEW HEALY,                )
4                                )
                                 ) CAUSE NO.
5          Plaintiff,            ) 1:11-cv-01184-WTL-DML
                                 )
6          -vs-                  )
                                 ) Indianapolis, Indiana
7  NATIONAL BOARD OF             ) April 20, 2012
   OSTEOPATHIC EXAMINERS, INC.,) 9:00 a.m.
8          Defendant.            ) VOLUME 2
                                 )
9

10

11                  **BEFORE THE**
           **HONORABLE WILLIAM T. LAWRENCE**
12

13        OFFICIAL REPORTER'S TRANSCRIPT OF

14                  BENCH TRIAL

15

16

17

18

19 Court Reporter:   Cathy Easley Jones, RPR, FCRR
                     Official Court Reporter
20                   46 East Ohio Street, Room 291
                     Indianapolis, IN  46204
21

22

23

24
        PROCEEDINGS TAKEN BY MACHINE SHORTHAND
25         COMPUTER-AIDED TRANSCRIPTION

1                        **A P P E A R A N C E S**

2

3    FOR THE PLAINTIFF:           Mr. Andrew Dutkanych
                                  BIESECKER DUTKANYCH & MACER
4                                 411 Main Street
                                  Evansville, IN  47708
5
     FOR THE DEFENDANT:           Ms. Kristen M. Carroll
6                                 Mr. Robert M. Kelso
                                  KIGHTLINGER & GRAY
7                                 One Indiana Square
                                  Suite 300
8                                 Indianapolis, IN  46204

9
     FOR THE DEFENDANT:           Mr. Sydney L. Steele
10                                KROGER GARDIS & REGAS
                                  111 Monument Circle
11                                Suite 900
                                  Indianapolis, IN  46204
12

13

14

15

16

17

18

19

20

21

22

23

24

25

Vol. 2 – 73

1

2                    **I N D E X   O F   W I T N E S S E S**

3                                                    PAGE

JED MAGEN
4  Direct Examination by Ms. Carroll ..............75
   Cross-examination by Mr. Dutkanych .............86

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    *(In open court)*

2         THE COURT:  Good morning, everyone.  We are on the

3    record on Cause No. 1:11-cv-1184-WTL-DML, Matthew Healy versus

4    National Board of Osteopathic Medical Examiners, Inc.  We are

5    now present for day two of the trial to the Court on the

6    issues presented.

7         Before we get started, I want to indicate that when

8    last we were together, it was.  The Court's obligation to

9    review the videotape depositions of Amanda Baten, Dr. Brewer,

10   as well as Mr. Bernier and Murphy.

11        The Court attempted to review those and found that

12   we could not get the sound to come through.  I have reviewed

13   the transcripts of the four depositions.  I have seen Amanda

14   Baten's video deposition that did indeed come through as far

15   as the sound.

16        We met preliminary to going on the record this

17   morning, and the Court was advised that the parties wanted to

18   proceed.

19        However, we will get some technical assistance and

20   listen and view the three remaining depositions post-trial but

21   very quickly after everything is submitted; and we will go

22   forward today with the live witnesses for the defendant, any

23   rebuttal from the plaintiff, do final argument and order

24   submissions.  And the Court will then acknowledge that I will

25   look at and view and listen to the remaining three videotaped

Vol. 2 – 75

1  depositions prior to any kind of ruling or consideration of

2  the case.

3          Is that consistent with our discussion,

4  Mr. Dutkanych?

5          MR. DUTKANYCH:  Yes, Your Honor.

6          THE COURT:  Ms. Carroll?

7          MS. CARROLL:  Yes, Your Honor.

8          THE COURT:  Okay.  At this point then, the Court has

9  heard all of the evidence of the plaintiff.  Is the plaintiff

10  ready to rest at this point?

11          MR. DUTKANYCH:  Yes, Your Honor.  The plaintiff

12  rests.

13          THE COURT:  Ms. Carroll, any motions from the

14  defendant?

15          MS. CARROLL:  No, Your Honor.

16          THE COURT:  Very well.  Would you present your first

17  witness, please?

18          MS. CARROLL:  Yes, Your Honor.  The defendant would

19  like to call Dr. Jed Megan to the stand, please.

20          **JED MAGEN, DEFENDANT'S WITNESS, SWORN**

21                  <u>**DIRECT EXAMINATION**</u>

22  BY MS. CARROLL:

23  Q   Please state and spell your name for the Court.

24  A   It's Jed Magen, J-E-D M-A-G-E-N.

25  Q   Dr. Magen, what is the NBOME?

1  A    The NBOME is an organization that exists to test the

2  knowledge base of osteopathic medical students and to really

3  protect the public.

4  Q    And the mission -- is that the mission of NBOE then?

5  A    Yes, it is.

6  Q    What is your role with NBOME?

7  A    I am chairman of the Test Accommodations Committee.

8  Q    And what is the Test Accommodations Committee?

9  A    The Test Accommodations Committee is a committee that

10 reviews requests for accommodations for the various national

11 board exams.

12 Q    Have you served in any other capacities for the

13 organization?

14 A    I have written questions for the various exams.

15 Q    What is the Test Accommodation Committee's obligation?

16 A    The Test Accommodation Committee receives requests for

17 accommodation from individuals who will be taking the exam.  A

18 variety of information those individuals submit.

19       We then review that information and make a

20 determination based on the best of our ability about whether

21 the disability exists and whether they should have an

22 accommodation and the type of accommodation.

23 Q    How long have you served on the committee?

24 A    About nine years.

25 Q    How long have you been the chair of the committee?

Vol. 2 - 77

1    A    About three years.

2    Q    What are your responsibilities as the chair of that

3    committee?

4    A    My responsibilities are really -- we have telephone

5    meetings, telephone conferences; and my responsibilities are

6    to run those conferences.

7    Q    Are you paid for serving on the committee?

8    A    No.

9    Q    How many members are on the Test Accommodations Committee?

10   A    I believe there are currently nine members.

11   Q    And you believe that is true at the time of Matthew

12   Healy's request?

13   A    I believe so.

14   Q    What are your qualifications, Dr. Magen?

15   A    I am an osteopathic physician.  I was a commissioned

16   officer in the United States public health service for three

17   years doing general medical work.  And then I attended a

18   general psychiatry residency at the University of Michigan and

19   a child and adolescent psychiatry fellowship and then stayed

20   on to do a research fellowship.

21         I went on to the faculty at Michigan State University,

22   where I was residency training director, and I'm now chairman

23   of the Department of Psychiatry in the two medical schools;

24   and I have been chairman for now nine years.  I have a

25   master's degree in healthcare management from the University

1  of Texas, Dallas.

2  Q    Do you also have a clinical practice?

3  A    And I do have a clinical practice in child and adolescent

4  psychiatry.

5  Q    And that's your specialty?

6  A    That is my specialty.

7  Q    Why did you choose that specialty and to volunteer for the

8  Test Accommodations Committee?

9  A    Why did I choose the specialty of child and adolescent

10  psychiatry?

11  Q    Yes.

12  A    I was always interested in issues around children,

13  including learning disabilities, as a matter of fact.

14  Q    And why is that?

15  A    Well, one of the reasons that's the case is I actually

16  have -- my youngest son actually has a physical disability for

17  which he receives accommodations in high school.  Therefore,

18  I've been on really both sides of this issue as a professional

19  and as a parent.

20  Q    What are the qualifications of the other members of the

21  Test Accommodation Committee?

22  A    The other members of the Test Accommodation Committee are

23  all osteopathic physicians.  We have a variety of disciplines,

24  including general psychiatry, child and adolescent psychiatry,

25  emergency medicine, family practice, anesthesiology.

1  Q    What tests does the NBOME administer?

2  A    NBOME administers really a variety of tests.  The one of

3  pertinence to this Court is really the COMLEX exam, which is

4  the national licensing exam for osteopathic physicians.

5  Q    Is this exam recognized internationally?

6  A    Yes, it is.

7  Q    How is the COMLEX Level 1 administered?

8  A    The Level 1 exam, which is the first exam, is a

9  computerized test.  So you go to a testing center; and on a

10 computer screen, you will read a series of questions.  The

11 questions are, essentially, short paragraphs, then with a

12 series of multiple choice answers.  The candidate then picks

13 the correct or incorrect answer on that exam, and it's

14 administered as two four-hour blocks in a single day.

15 Q    What is the format?

16 A    The format's a multiple-choice format.

17 Q    With paragraphs, sentences and then questions?

18 A    Yes.

19 Q    What does the COMLEX Level 1 exam measure?

20 A    The Level 1 exam is designed to measure medical knowledge

21 and especially what we would call basic science and to some

22 extent clinical knowledge.

23 Q    Are abilities to write or communicate measured by the

24 COMLEX Level 1?

25 A    They are not.

Vol. 2 - 80

1  Q    Explain the general process, please, to the Court that the

2  NBOME Test Accommodations Committee utilizes to evaluate an

3  applicant's request for accommodation.

4  A    Well, generally, what happens is an applicant will make a

5  request for accommodations, at which time we ask for a certain

6  series of information.  The examiners then gather that

7  information, send it to the board offices.  It's then placed

8  on a protected website, and all the members of the committee

9  can then look at that information on the protected website.

10 So we all do that prior to the meeting.  We schedule

11 once-a-month phone conferences where we then discuss that

12 information.

13        We also have access to reports from experts who are

14 employed by -- are employed to give us their opinion to our

15 committee as well, and we then consider really the totality of

16 that information.

17 Q    And do you then meet and discuss and there's questions

18 regarding this information?

19 A    Yes.  The -- we meet in the telephone conference, and we

20 discuss the information we have.

21 Q    And is this when -- when you meet in the telephone

22 conferences, is this when a determination is made?

23 A    Yes.

24 Q    What specific standard does the Test Accommodations

25 Committee consider in determining whether requests for

1  accommodations should be accepted or denied?

2  A    Well, we follow the ADA based on our understanding, which

3  is really a physical or mental condition that results in a

4  substantial limitation of a major life activity as compared to

5  normal individuals in the population.

6  Q    As to this particular case, did the Test Accommodations

7  Committee receive and review a request for accommodation for

8  the COMLEX Level 1 examination from Matthew Healy?

9  A    Yes.

10 Q    What accommodation was Mr. Healy requesting?

11 A    I believe Mr. Healy was requesting double time on the exam

12 and a quiet room.

13 Q    Why did Mr. Healy indicate that he was requesting an

14 accommodation?

15 A    He was requesting that based on his presentation of

16 diagnoses of reading disorder, NOS, which means not otherwise

17 specified in our diagnostic lexicon, anxiety disorder not

18 otherwise specified and attention deficit-hyperactivity

19 disorder not otherwise specified.  It's probably important to

20 note that I don't believe we received all those diagnoses at

21 the first meeting that we had.

22 Q    So did the Test Accommodations Committee make a

23 determination on Mr. Healy's request for accommodation?

24 A    We did.

25 Q    And what was that?

1   A    We denied his accommodation.

2   Q    Was there more than one determination regarding Matthew

3   Healy's request for accommodation?

4   A    Yes.  This was a process over time.  There were actually

5   three meetings where we discussed Mr. Healy's request.

6   Q    Do you recall when the first meeting was?

7   A    The first meeting was about June 21st maybe.

8   Q    What was the determination of the Test Accommodation

9   Committee at that time?

10  A    We voted unanimously -- that would be six-nothing -- to

11  deny his accommodation at that point.

12  Q    What was the basis for the denial at that time?

13  A    Well, I think what we really struggled with was

14  considering the ADA standard, whether this was really a

15  disorder that had been present during the applicant's lifetime

16  because these are really -- especially ADHD and reading

17  disorder ought to be developmental disorders; and what that

18  really implies is that you ought to see manifestations of the

19  disorder and dysfunction really from very early on.

20  Q    What documentation was reviewed at that time -- at the

21  time of the initial request and denial?

22  A    We had the information that Mr. Healy completed.  We had

23  Dr. Baten and Dr. Brewer's -- actually, I don't believe we had

24  Dr. Brewer's information in the first meeting, but we

25  certainly had Dr. Baten's information.

1  Q   So then there was an appeal by Mr. Healy?

2  A   Yes.

3  Q   And what was the determination -- were there additional

4  documentations received by the Test Accommodation Committee at

5  that time?

6  A   I believe that we then got some information from

7  Dr. Brewer as well.

8  Q   What was the determination by the Test Accommodations

9  Committee at that point?

10 A   We again denied the request for accommodation.

11 Q   What was the vote on that?

12 A   The vote on that one I believe was 4-0.  And actually, I

13 believe I was slightly in error earlier in my deposition.

14 Although I was not present at the last meeting, I did vote

15 later by e-mail after reviewing all his information.  So it

16 was probably five-nothing.

17 Q   So then there was -- so that was the second determination

18 by the Test Accommodation Committee?

19 A   I believe that was the second determination.

20 Q   Then there was a final determination?

21 A   Which was the one I was just referring to.

22 Q   And then at that point, was there additional documentation

23 received in addition to what had already been provided?

24 A   We may have received a second letter perhaps by

25 Dr. Brewer.

Vol. 2 - 84

1  Q   And what was the determination by the Test Accommodation

2  Committee at that point?

3  A   That was the 4-0.

4  Q   What was the basis for that decision?

5  A   The basis was, again, that we didn't believe -- and again,

6  we really struggled with this.  We didn't believe that he met

7  ADA criteria to receive an accommodation.

8  Q   Just for clarification, so the first vote was 6-0.  What

9  was the second vote?

10  A   I actually don't recall what the vote was at that point.

11  Q   Do you believe it was unanimous?

12  A   It was unanimous.

13  Q   You just don't know how many?

14  A   I don't remember the numbers.

15  Q   And were all these -- the documents that were submitted by

16  Mr. Healy reviewed and considered by the Test Accommodations

17  Committee?

18  A   Yes.

19  Q   Could you please refer to Exhibit 201-1?  Could you

20  quickly review that exhibit, Dr. Magen?  Is this a true and

21  accurate copy of the complete NBOME file on Matthew Healy that

22  includes all the documentation that the Test Accommodations

23  Committee reviewed and relied upon in forming its decision

24  regarding his request for accommodation?

25  A   Yes, I believe it is.

1  Q   What other information was considered by the Test

2  Accommodation Committee prior to its final determination?

3  A   We discussed the material we have, and we also discussed

4  the experts' opinion that we've received and then make ha

5  determination based on all the information we have.

6  Q   Do you look at prior accommodations?

7  A   We do.

8  Q   But you look at -- is there -- do you look at everything

9  in total?  Do you consider everything in totality?

10  A   Yes, absolutely.

11  Q   And did the Test Accommodations Committee ever determine

12  if the requested accommodations were reasonable?

13  A   We never got to that point because it was our

14  determination prior to that that he did not meet criteria for

15  a disability.

16  Q   What was the basis for your vote to deny Matthew Healy's

17  request for accommodation?

18  A   Well, again, I think we all struggled with this.  In my

19  particular case, when I looked at the material, one, it did

20  not appear to me that there was history that this is really a

21  developmental disorder through the lifetime.

22        One of the criteria, whether you're talking specific

23  psychiatric criteria in the DSM, the Diagnostic Statistical

24  Manual of Mental Disorders, you must have some dysfunction

25  demonstrated early on.  It did not appear that Mr. Healy had

1    demonstrated that there was early dysfunction in school or in

2    other kinds of settings.

3    Q    Anything else that was the basis for your vote?

4    A    In addition, the diagnoses were all with the appendage

5    "not otherwise specified"; and it makes it -- it's more

6    difficult because there are no specific criteria for those

7    diagnoses.  Those are essentially what we often call in the

8    profession wastebasket diagnoses.

9         When you don't have enough material to meet the formal

10   criteria for the disorder, you might say, well, it's just not

11   otherwise specified.  So it was clear from the evaluations by

12   the evaluators that he did not meet criteria for specific

13   disorders.  So that was problematic as well.

14   Q    Throughout this process, did you utilize your own

15   education and experience?

16   A    Yes.

17             MS. CARROLL:  Thank you.  No further questions.

18             THE COURT:  Your witness, Mr. Dutkanych.

19                       **CROSS-EXAMINATION**

20   Q    Dr. Magen is the COMLEX Level 1 exam a timed exam?

21   A    Yes, it is.

22   Q    Is it intended to measure how fast an applicant can answer

23   questions?

24   A    No.

25   Q    Did you ever meet personally with Matthew Healy?

1  A    No, I did not.

2  Q    Did anybody on the Test Accommodation Committee meet first

3  with Mr. Healy before making its determination?

4  A    I don't believe so.

5  Q    Did either of your experts meet personally with Mr. Healy

6  before rendering their decision?

7  A    No.

8  Q    Do you contend that Mr. Healy does not read more slowly

9  than the average person?

10 A    Based on the testing information we received, it does not

11 appear that Mr. Healy reads slow enough that he has a

12 disability.  He may or may not read slower than various people

13 in the general population.

14 Q    Is your evaluation based on the documentation and not

15 actually the person?

16 A    My evaluation was based on the totality of the

17 documentation we received, which is what candidates are asked

18 to submit.

19 Q    Do you contend that reading is not a major life activity?

20 A    Reading is certainly a major life activity.

21 Q    Has the NBOME provided double time to other applicants?

22 A    Yes.

23 Q    Have they provided a quiet room to other applicants?

24 A    I'm sorry?

25 Q    Have they provided a quiet room to take the exam?

1   A   Yes.

2           MR. DUTKANYCH:  Those are all the questions that I

3   have.

4           THE COURT:  Redirect, Ms. Carroll?

5           MS. CARROLL:  No, Your Honor.

6           THE COURT:  Let me ask a question, Dr. Magen.  You

7   suggested that the disability would have presented earlier on

8   in most cases similar to what presented in Mr. Healy's case;

9   is that correct?

10          THE WITNESS:  Correct.

11          THE COURT:  Did the board consider the fact that he

12  had somewhat of a unique educational experience leading up to

13  his matriculation at NYU?  By that, I mean, tutors.  He had

14  different -- was only at one point taking core classes.  Did

15  it look specifically at the type of educational structure

16  Mr. Healy had leading up to his matriculation at NYU in

17  particular?

18          THE WITNESS:  I believe we did.  The issue really is

19  that if you have a significant psychiatric disorder -- so you

20  have attention deficit-hyperactivity disorder, say, and/or you

21  have a reading disorder, one of the criteria in the

22  psychiatric nomenclature is that that disorder should really

23  manifest itself in a variety of environments.

24          So it shouldn't at -- at the most basic level, it

25  shouldn't only be in school.  The parents should complain of,

1  say, "Oh, this child doesn't follow three-step directions.

2  He's hyperactive and so on."

3         Similarly, in another kind of school environment,

4  while it's certainly possible that some symptoms may be

5  moderated, it's really difficult to believe that you wouldn't

6  demonstrate any symptoms that someone wouldn't pick up.

7         In a one-to-one setting, for example, where you

8  receive tutoring, one still ought to notice significant

9  inattention, difficulty with distractibility and that sort of

10 thing.  That's really the basis of the way we make a

11 diagnosis.  If, in fact, we see somebody who has

12 manifestations of a disorder in only one setting, that takes

13 us aback to some extent.

14         THE COURT:  Cross on the Court's questions,

15 Ms. Carroll?

16         MS. CARROLL:  No, Your Honor.

17         THE COURT:  Mr. Dutkanych?

18         MR. DUTKANYCH:  No, Your Honor.

19         THE COURT:  Very well.  You may step down.

20    (Witness excused.)

21         THE COURT:  Further live witnesses, if you will,

22 from the defendant?

23         MS. CARROLL:  No further witnesses, Your Honor.

24         THE COURT:  Defendant rests?

25         MS. CARROLL:  Yes, Your Honor.

1          THE COURT:  Rebuttal from the plaintiff?

2          MR. DUTKANYCH:  No, Your Honor.

3          THE COURT:  Very well.  All right.  The evidence has

4   been presented at this point.  The Court would be entertaining

5   final arguments in this matter.  Do you all want a minute or

6   are you ready to go forward now?

7          MR. DUTKANYCH:  I'm ready to proceed.

8          THE COURT:  Very well.  For the plaintiff,

9   Mr. Dutkanych.

10          MR. DUTKANYCH:  Your Honor, in 1990, Congress passed

11   the Americans With Disabilities Act to level the playing field

12   for disabled people.  But according to Congress, the Courts

13   applied the act incorrectly by requiring that the definition

14   of disability needed to be interpreted strictly to create a

15   demanding standard for qualifying as disabled.

16          In 2008, Congress corrected the error.  It passed

17   the amendments to the ADA with the specific purpose of

18   rejecting the demanding standards created by the Supreme

19   Court.  The amendments conveyed that the standard created by

20   the Supreme Court set an inappropriately high level of

21   limitation necessary to obtain coverage under the ADA.  With

22   the amendments, Congress conveyed that the question of whether

23   an individual's impairment is a disability under the ADA

24   should not demand extensive analysis.  Here, however, the

25   defendant continues to apply the demanding requirements that

1  were specifically rejected by Congress.

2          Mr. Healy has offered sufficient evidence that he is

3  disabled under the ADA.  We have heard testimony of the

4  difficulties that he experienced throughout his childhood.

5  Consistently, the evidence demonstrates that there is a

6  significant disparity between his IQ and his performance.

7          At four years old, it was noted that there was

8  almost a year's difference between receptive and expressive

9  language skills.  At eight years old, Madge Connor's

10  diagnostic impressions found his general intellectual

11  capability to be in the superior range, with significant

12  disparity between the verbal and performance ability.

13          Based on her testing, Dr. Amanda Baten found that

14  Mr. Healy's ability to rapidly visually scan and match

15  different symbols was within the below average range.  She

16  found that his sustained alphanumeric sequencing was low

17  average.  Importantly, Dr. Baten found that Mr. Healy's

18  reading speed placed him in the bottom 25 percent of test

19  takers and that his score was significantly lower than his

20  reading comprehension.

21          She concluded that Mr. Healy was substantially

22  limited in his ability to read.  She also determined that he

23  suffered from an anxiety disorder.  As a result, she

24  recommended that he be provided with double time and a quiet

25  setting to take examinations.

1          Dr. Baten's recommendation was formed after she

2    conducted a battery of tests on Mr. Healy, not once but twice.

3    Her recommendation was sufficient for New York University to

4    provide Mr. Healy with the accommodations of double time in a

5    private setting for examinations.  Her evaluations were

6    sufficient for the Academy of American Medical Colleges to

7    grant him an accommodation of double time in a private setting

8    to take the MCAT exam.

9          Her medical opinion was sufficient for TouroCOM to

10   provide Mr. Healy with the same accommodations, but it's not

11   good enough for the defendant.  Though none of the individuals

12   offering their opinion for the defendant have even met or

13   examined Mr. Healy, they suggest the documentation is

14   insufficient to grant Mr. Healy an accommodation.  We submit

15   that the defendant's rigorous documentation requirements are

16   simply incompatible with Congress's intent for the way that

17   the ADA is to be applied.

18         The Department of Justice regulations require that

19   the COMLEX Level 1 exam be administered to reflect Mr. Healy's

20   aptitude or achievement rather than his impairment.  Mr. Healy

21   requires additional time in a private setting for the COMLEX

22   Level 1 to accurately measure his true aptitude.  Mr. Healy

23   has come forward with sufficient evidence to support his

24   request for an accommodation; and as such, we request that the

25   Court require that the defendant allow him double time in a

1    private setting to take the COMLEX Level 1 exam.  Thank you.

2             THE COURT:  Thank you, Mr. Dutkanych.

3             Ms. Carroll, on behalf of the defendant.

4             MS. CARROLL:  Your Honor, this is not the type of

5    person the Americans With Disabilities Act, even as amended,

6    was designed to protect.

7             As Dr. Magen testified, the Test Accommodation

8    Committee is compiled of nine physicians, three of whom are

9    psychiatrists.  They carefully review all documentation

10   submitted to them, including prior accommodations; but because

11   their obligation as a gatekeeper for those entering the

12   practice of medicine is to the public, they must look at the

13   totality of the circumstances and look at each application on

14   an individual, case-by-case basis.  They did so in this case

15   and determined unanimously that there's no evidence to

16   establish a disability under the ADA.

17            We heard from plaintiff testify that he may read

18   slow and have difficulty concentrating.  As we all observed

19   yesterday, he had no difficulty reading his essay under these

20   very intense and intimidating circumstances.  This is

21   consistent with the objective -- what the objective evidence

22   in this case demonstrates.

23            Ms. Healy testified that she believes her son has a

24   learning disability.  However, considering the medical

25   background of she and her husband and if there were problems

1   as she and plaintiff have testified, then why was there no

2   treatment or evaluation for over 13 years?  The records tell

3   us the answer, and they reflect a different story:  No

4   learning disability at the age of eight was diagnosed.  Top of

5   his class all the way through his academic history; timed

6   standardized tests above the national average.

7           As to the issue with anxiety, Dr. Brewer said that

8   plaintiff's complaints of anxiety were related to pressure

9   getting into medical school and in test-taking situations,

10  which plaintiff acknowledged.  The case law is clear that test

11  taking is not a major life activity, and the case law is also

12  clear that test anxiety is not an impairment that rises to the

13  level of a disability under the ADA.

14          Let's look briefly before we -- at the ADHD before

15  we move on to the reading disorder.  Dr. Brewer acknowledged

16  that ADHD is a disorder with onset of signs and symptoms in

17  childhood.  He also acknowledged that the only documentation

18  that he had in his file was Dr. Baten's report, which

19  specifically indicated no signs or symptoms of ADHD.

20          He acknowledged that the tests he conducted at the

21  initial evaluation two months later also did not establish the

22  diagnosis.  Yet, Dr. Brewer, who treats plaintiff's mother and

23  who has known the family for years and who was seen in an

24  effort to obtain accommodations for the MCAT, rendered a

25  diagnosis of ADHD merely upon self-report without any further

1  testing or review of any documentation, certainly, not the

2  letters of recommendation in the evidence.

3          Dr. Murphy, an expert in ADHD, testified that the

4  overall picture just -- is not consistent with ADHD.

5  Specifically, he said, no consistent problems with attention,

6  concentration, impulsivity, disorganization, distractibility,

7  executive functioning or self-control, from childhood,

8  adolescent and adulthood.  Dr. Murphy points to his academic

9  employment and extracurricular accomplishments, not consistent

10 with ADHD.

11         Now, moving on to the reading disorder, Amanda Baten

12 acknowledged she's not an expert in neuropsych evaluations.

13 Yet, in 2002 and 2006, she conducted, analyzed and based the

14 diagnosis of reading disorder on plaintiff based upon those

15 tests.

16         In 2006, her report specifically says, "performed

17 much better on tasks that assessed his capability to read

18 sentences and paragraphs and answer questions about what was

19 read."  That's the exact format of the COMLEX 1 level

20 examination, the test for which plaintiff is seeking an

21 accommodation.

22         The exhibit I have displayed, the red line is the

23 average person.  Dr. Baten acknowledged that the Xs that you

24 see on here accurately reflects the result -- the overall

25 results.  His intellectual and academic ability is above

1    average as compared to most people of the general population.

2          Dr. Bernier, who specializes and is an expert in

3    neuropsych evaluations, pointed out in his testimony that on

4    the Wechsler individual achievement test, plaintiff's reading

5    and accuracy and comprehension, which are afforded

6    considerable weight under the DSM and the diagnosis of a

7    reading disorder, were in the high average to above average

8    superior range.

9          Now, Amanda Baten's diagnosis is based upon

10   discrepancy in IQ and performance.  First, the disparity

11   between IQ or inherent capacity and performance has been

12   rejected by the Courts as a determination for a basis of

13   disability.  The standard isn't achieving to your potential.

14   It is in comparison to most people in the general population.

15         For example, you're an ultra -- injured ultra

16   marathoner.  You run a hundred miles.  You're not disabled

17   when you receive an impairment that now forces you to quit

18   ought 26 miles, even though the limitation is substantial as

19   compared to his unimpaired abilities and those of other

20   runners.

21         As Dr. Bernier explains, everyone has cognitive

22   strengths and weaknesses.  Even in Matthew Healy's case, his

23   relative weaknesses are still in the average range as compared

24   to most people in the general population.

25         The purpose of accommodations under the ADA is to

1  provide equal access.  Plaintiff's counsel indicated leveling

2  the playing field.  It's not what is happening here.

3  Plaintiff is wanting to facilitate success or optimize his

4  test scores, and that is not what the purpose of the ADA is.

5          Matthew Healy is not the type of person the law was

6  designed to protect.  The person the law was designed to

7  protect is the person with a physical or mental impairment

8  that substantially limits a major life activity as compared to

9  most people in the general population.  That was the standard

10 prior to 1990.  That is still the standard today.  That has

11 not been established in this case.  Thank you.

12         THE COURT:  Thank you, Ms. Carroll.

13         Mr. Dutkanych, anything further?

14         MR. DUTKANYCH:  Just quickly, yes.

15         Your Honor, this isn't an ultra marathon.

16 Mr. Healy's not able to run 100 miles or 26 miles.  The test

17 has the same number of questions for everybody taking the

18 test, but Mr. Healy cannot complete the test.  He couldn't

19 complete the SATs.  He can't complete this test in the same

20 amount of time as everybody else.  That's a standardized

21 condition.

22         He's not trying to do something more exceptional

23 than everybody else taking the test.  He's trying to do the

24 same thing as everybody else taking the test; but he can't

25 because as Dr. Baten found, he reads slower than the average

Vol. 2 - 98

1  person.

2          Their expert, Dr. Bernier, when asked what the

3  clinical definition of a reading disorder was, stated that,

4  "The diagnosis calls for a significant discrepancy on reading

5  skills measures and IQ measures and also includes that a

6  person is reading at a level that wouldn't be expected for

7  their educational background."  That's their expert.

8          Mr. Healy is asking for the Court to apply the ADA

9  as it's been amended, not to adopt the rigorous standard that

10 the defendant is trying to apply, clearly, a more rigorous

11 standard than NYU applied, the Association of American

12 Colleges applied and TouroCOM applied.  We're asking for the

13 Court to render a decision that's consistent with the ADA.

14 Thank you.

15          THE COURT:  Thank you, Mr. Dutkanych.

16          All right.  That would conclude the trial of this

17 matter.  The Court would ask that any post-trial submissions

18 be submitted by the close of business on Tuesday.  That would

19 be the 24th.  The Court, as I have indicated, will take the

20 afternoon.  Hopefully, we can remedy the technical glitches to

21 the video depositions; and I can review those either this

22 afternoon or at the latest by Monday.

23          Anything further from the plaintiff, Mr. Dutkanych?

24          MR. DUTKANYCH:  No, Your Honor.

25          THE COURT:  From the defendant, Ms. Carroll?

1          MS. CARROLL:  No, Your Honor.

2          THE COURT:  Very well.

3          COURT CLERK:  Please rise.

4          Court stands adjourned.

5          *(The proceedings were adjourned at 10:15 a.m.)*

1                 <u>CERTIFICATE OF COURT REPORTER</u>

2

3     I, Cathy Jones, hereby certify that the foregoing is a

4 true and correct transcript from reported proceedings in the

5 above-entitled matter.

6

7

8   /s/ Cathy Jones               July 17, 2012
   _____

9   CATHY JONES, RPR, FCRR
   Official Court Reporter

10  Southern District of Indiana
   Indianapolis Division

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25